# JOSEPH E. OTIS *et al.*

## *v.*

# THOMAS S. BECKWITH *et al.*

1. TRUSTS AND TRUSTEES—*relative to the enforcement of trusts by courts of equity.* Where a policy of insurance on the life of the assignor, was voluntarily assigned by him to a trustee, for the benefit of his three children, notice of which assignment and trust was given to tne company, and also to such trustee, who sent to the assignor his written acceptance thereof, but the policy and assignment remained in the possession of the assignor, and was found after his decease among his other papers: *Held,* in a suit by the trustee against the administrator of the assignor, to compel a surrender of the policy to him as such trustee, and that he be declared the owner thereof:—

1st. That an actual delivery of the policy and assignment thereof to the trustee, was not necessary in order to complete the trust created.

2d. That the acts of the parties—the one notifying the other of the assignment and trust, and his written acceptance thereof, constituted a sufficient delivery to complete the title of the trustee.

3d. That the object sought to be accomplished by the assignor in making the assignment, namely, to make provision for his orphan children, being fully established, equity will carry out such intention, though the transfer be voluntary and without consideration, he never having manifested any desire to retract the act.

2. SALES—*intention of parties—a controling element.* In such cases, equity will look to the substance of the act done, and the intention with which it was done, and in the absence of fraud, carry out such intention, and give it full effect.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

The opinion states the case.

Mr. GEORGE HERBERT, for the appellants.

Mr. T. A. MORAN and Messrs. MONROE & McKINNON, for the appellees.

16—49TH ILL.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery, exhibited in the Superior Court of Chicago, by Thomas L. Beckwith, claiming to be the assignee of Edward Sacket, deceased, of a certain policy executed by the New York Life Insurance Company, to the deceased in his lifetime, against Joseph S. Otis, the administrator, Hannah L. Sacket, the widow, and Hobart S., George B., Frederick A., and Walter D. Sacket, his heirs at law, and the insurance company.

The bill alleges the policy was for $3,000 upon the life of Edward Sacket, and was delivered to him on or about the 10th of February, 1862, and that he, thereafter, paid up all premiums upon it, and on February 18th, 1862, being desirous of making provision for his three sons, Hobart S., George B. and Frederick A. Sacket, in case of his death, he procured the consent of the company to assign the policy to complainant, for the use and benefit of these three sons, as trustee, and executed and delivered an assignment of the policy to complainant as their trustee, of which, on the 4th of December, 1862, he notified complainant, and asked him to accept this trust, to which, complainant immediately responded, accepting the same.  That Sacket died January 17, 1866, leaving, besides these three sons, another son, Walter D., and Hannah L., his widow, his only heirs, and that Otis is the sole administrator.

The bill alleges that this policy, on the death of Sacket, was found with his other papers; that it was the intention of deceased to vest it in complainant as trustee of the three sons named; that the insurance was effected for their benefit, and that deceased, from the time of the assignment until his death, considered it as belonging absolutely to complainant, as trustee for these three sons, and that the policy and assignment attached, and complainant's letter of acceptance, were found folded together, by Otis, the administrator, after Sacket's death.

That Hobart S., George B. and Frederick A., were children by a former wife, and Walter D. was the child of the widow; that the assignment was made for the benefit of the three first ·named sons, for the reason that the other and youngest son would inherit of his mother, who had property in her own right, to an amount much exceeding the life insurance and other property left by the deceased.

The bill further alleges, that complainant demanded the policy of the administrator, Otis, who refused to· surrender it, on the suggestion of the widow, who claimed it as part of the personal estate of her deceased husband.

Complainant claims the legal and equitable .title to this policy, and denies any right, legal or equitable, in the administrator to the policy, or to the possession of the same, and says, the insurance company are ready and willing to pay the same to him when he produces the policy, which he is unable to do, and because it has been notified, by the administrator, not to pay it to him.

The prayer is, that the administrator surrender the policy to complainant, and that he be declared the owner thereof, as trustee, and for general relief.

The policy is made exhibit [A], and it provides, that if assigned, a copy of the assignment shall be given to the company, and it is as follows :

"CHICAGO, February 18, 1862.

"For value received, I hereby assign all my right, title and interest in the within policy, to Thomas S. Beckwith, of Cleveland, trustee for my children, to be divided in equal sums of $1,000, as follows, viz.: $1,000 to Hobart Sterling Sacket; $1,000 to George Beckwith Sacket, and $1,000 to Frederick Augustus Sacket.

"EDWARD SACKET.

"*Signed in presence of* C. L. NORTH."

Exhibit " B " is as follows :

" Chicago, February 18, 1862.

" For value received, I hereby assign my right, title and interest in the within policy, 16,289, in the New York Life Insurance Company, of New York, to Thomas S. Beckwith, trustee, of Cleveland, for my children, to be divided in equal sums of $1,000, as follows, viz.: $1,000 to Hobart Sterling Sacket, $1,000 to George Beckwith Sacket, $1,000 to Frederick Augustus Sacket.

"Edward Sacket.

" *Witness,* Mills Olcott."

" The above assignment noted on company books.

"Thos. M. Banta, Cashier."

Exhibit " C " is as follows :

" Cleveland, December 6, 1862.

" Mr. Edward Sacket, *Chicago, Ill.:*

" Dear Sir :—You having made me, for your children, a trustee in the matter of a life policy insurance on your life, in the New York Life Insurance Company, for three thousand dollars, is satisfactory, and I accept the trusteeship.

" Yours truly,

" T. S. Beckwith."

Otis, the administrator, answered, denying any equity in the bill, admitting himself to be sole administrator, and claiming the policy and money due upon it, as assets of the estate.

The infant defendants answered by guardian *ad litem,* also denying the equities of the bill, and calling for proof.

H. L. Sacket, the widow, answered at length, admitting the policy, and that it was in the hands of Otis, but denies consent of the insurance company to its assignment, and denies deceased ever made or executed any assignment of the policy,

or notified complainant of what he had done, or asked him to act as trustee, but insists that the policy, with the endorsement upon it, was always in the possession of deceased, until the day of his death, and that the pretended assignments were without consideration, and were never out of the possession or control of deceased, and were left with respondent, at deceased's dwelling house in Chicago, with his deeds and other papers, when he went on his last journey to Wisconsin, where he died; and neither of them was ever delivered to complainant, nor to any one in his behalf, and that they remained in his possession until after his death, when they were deposited in a banking house for safe keeping, and that complainant's letter of acceptance was casually found among the other letters of deceased, and placed with the other papers, but was not found with the policy, or with the pretended assignment thereof. Denies the intention of deceased to vest the policy in complainant, averring that deceased always controlled the assignment and kept possession of it, so that it should not vest in complainant absolutely, and that deceased might, from time to time, in his lifetime, make such other or different disposition of it as he might deem just and reasonable, and avers, that he failed to carry any legal transfer into effect, and that the title to the policy, neither in law nor in equity, ever vested in complainant, whatever he intended, and she claims, that it belongs to the estate of deceased, and insists that the assignment was inoperative, void, voluntary, and without consideration.

This is all that is necessary to extract from the answer, as thereby, the points in controversy are distinctly presented. Replications were put in, and testimony taken, establishing the material facts charged in the bill, and on the hearing, the court found that the insurance was effected, and at the time of effecting it, the assured intended it for the benefit of his three sons by his first wife, and after notifying complainant, assigned the policy to him in trust, for the three sons, and

endorsed it on the policy, of which fact, deceased notified the insurance company, defendant, and it was noted on the books of the company, and of which assignment in trust, complainant had notice on or before December 6, 1862, and accepted the trust; that Edward Sacket died January 17, 1866, and that the policy and assignment thereto attached, were found among his papers, and also the letter of acceptance of complainant; that Otis was administrator, and took possession of the policy and assignment, and refused, on demand of complainant, to surrender it to him.

The decree further finds that, by stipulation, the amount due on the policy, being $2,938.39 cents, was paid Otis, who now holds the money subject to the order of the court, and the court ordered and decreed that the same be paid by Otis to complainant.

To reverse this decree, Otis, H. S. Sacket and Walter D. Sacket, appealed to this court, assigning the same for error.

Appellants make the point, that neither the policy, nor any assignment of it, was ever delivered to complainant, or to any person for him. That the assignments were not under seal—they were voluntary and without any pecuniary or valuable consideration, and without any previous agreement, or legal obligation to make any such assignment; that the assignment did not take effect for want of delivery—that they were imperfect and mere inchoate acts, not complete without delivery, and that the legal title to the policy, and to the money payable on it, did not pass to, or vest in complainant, but remained the property of Edward Sacket, and subject to his control until his death, and the money is assets of his estate, and having been paid to the administrator, it is in the right hands and should there remain.

Appellants' counsel has cited a vast number of authorities, supposed to sustain these several points, giving evidence thereby, of the very thorough investigation to which the case has been subjected, which we have examined, especially the

case of *Antrobus* v. *Smith*, 12 Vesey 39, which counsel says, " was on all fours," with this case. This being so, we have given that case a close examination and will state it from the books, as we understand it:

One Gibbs Crawford was entitled to ten shares, of one hundred pounds each, in the Forth & Clyde Navigation. He wrote, upon the receipt for one of the subscriptions, and signed the following endorsement, dated October 4, 1790 : " I do hereby assign to my daughter, Anna Crawford, all my right, title and interest, of, and in the enclosed call, and all other calls, of my subscription in the Clyde & Forth Navigation."

Anna afterwards married Antrobus, and died on the 18th June, 1793. Her father died in October of the same year, and her husband in April, '94. Anna Crawford, the widow of Gibbs Crawford, and mother of Mrs. Antrobus, died in '97, and a short time after her death, the elder of her two sons, both of whom, under the execution of a power of appointment given to her by the will of her husband, took the residue of his personal estate, in searching a closet in the country-house of his father, found the receipt above stated, with the endorsement upon it, in a pocket-book, which had belonged to his mother, with other papers relating to his father's personal estate, and securities for moneys due to him.

· The bill was filed by the brother and personal representative of John Antrobus, praying that a proper assignment of the canal share may be executed, and that the receipts given on that amount may be delivered up.

The two sons of Mr. Crawford stated in their answer to this bill, and it was proved, that subsequent to the date of the indorsement on the receipt, their father considered himself as the owner of that share, and in 1791-2, sat, constantly, as one of the committee and as a director, having no other interest in the Navigation except that share or subscription. They also represented, that the portion of £10,000 given by Mr. Crawford, upon the marriage of his daughter, was intended

to be in lieu of all claims and demands whatsoever, by her or her husband.

The defendants, with their answer, filed a cross-bill, which the plaintiff, Antrobus, answered, and therein stated, that he was informed by his brother that, in a conversation respecting the canal share, Anna said to her father, "You know, father, you gave me £1,000 of that stock;" upon which he answered, "Yes; but you will recollect that I have since given you £10,000 which has done that away."

It was proved by the scrivener employed to prepare the settlement upon the marriage of Mr. and Mrs. Antrobus, that it was agreed that Mr. Crawford would give £10,000 as a marriage portion, which should be accepted by her in full of all her other claims upon his estate and property; and the witness had been before informed by Mr. Crawford, that he had given his daughter a share in the Forth & Clyde Navigation; and at the time the settlement was progressing, he informed the witness that he considered £10,000 as a large portion, but it was to be in lieu of that, and of every other claim of his daughter under the settlement, or deed of appointment, or otherwise.

It was argued, on these facts, for the plaintiff, that a voluntary conveyance, though defective, will be executed by chancery, if intended as a provision for a child, citing *Bonham* v. *Newcomb*, 2 Ventris, 365, and a passage in *Colman* v. *Sarvell*, 1 Vesey, 50.

Counsel for defendants, the sons of Crawford, contended, that to induce the court to act, to effectuate a gift *inter vivos*, there must be a valuable, or at least a meritorious, consideration, citing authorities. They argued, that the court had never proceeded upon a voluntary instrument kept in the possession of the party, to perfect an inchoate act that never was completed; at least, the intention ought to be clear, direct, and unequivocal, and if manifested by writing, that writing ought to have been delivered. They admitted, that a gift without

consideration was good, but was revocable before delivery. The subsequent facts destroyed all color of title, which, if it could be supposed existed originally, was satisfied and extinguished upon the marriage of Mrs. Antrobus, and a particular intention to the contrary, appears by the evidence.

Counsel for plaintiff argued, that the father meant to make himself a trustee for his daughter, of these shares, and the paper should be considered a declaration of trust; that the doctrine, as to voluntary provision, was never applied by a father to his child; that the distinction was continually taken with reference to the natural obligation.

Upon this remark by counsel, the Master of the Rolls, Sir William Grant, one of the ablest chancery lawyers of whom England can boast, who heard the cause, put this question : " Do you recollect any instance in which the party was compelled to perfect the gift, even in favor of a child ?" The answer was, the relief does not require that any act should be done, this being a declaration of trust.

The Master of the Rolls, in deciding the cause, said : " I do not see how this assignment can be decreed. The facts of the case are in great obscurity. That must operate unfavorably to the plaintiff, for this paper comes out of the possession of the executrix of Mrs. Crawford. The presumption, therefore, is, either that it has always remained in his possession, or, that if ever parted with, it had been delivered back to him. Upon the latter supposition, taken with the provision made upon the marriage, there is an end of the question." After commenting on the absence of proof of delivery to the daughter, the court proceeds: " When there is a voluntary and imperfect gift of this kind, the party reserving the instrument in his own power, during his whole life, is it possible, after his death, to enforce a specific performance of the engagement which that instrument contains, or to enforce a legal execution of that assignment which it purports to make; taking into consideration that the parent did not die without having

17—49th Ill.

expressed an intention, upon his part, not to carry into execution that gift; for it is evident that Mr. Crawford himself never would, unless compelled, have acted upon this assignment; that he never would have done anything to perfect it, which appears from his declarations to his daughter and to Silverfork (the scrivener), both purporting that he considered this gift as completely at an end, as done away with, by the provision made upon her marriage." Then the court puts the question: "Has a case ever occurred, in which a court of equity has interfered to give effect to an instrument attended with these *two* circumstances: 1st. That there is no evidence that the parent ever parted with the possession of it; 2d. a declared intention, by him, not to act upon that instrument, or to give effect to it, having died with the conception, that he was owner of the property, which he, at one time, intended to give away?"

The court further says: "He meant a gift. He says he assigns the property. But it was a gift not complete. The property was not transferred by the act. Could he, himself, have been compelled to give effect to the gift by making an assignment? There is no case in which a party has been compelled to perfect a gift, which, in the mode of making it, he has left imperfect. There is *locus pœnitentiæ*, as long as it is incomplete, and *Mr. Crawford did repent;* that is, he changed his mind upon what he then thought a sufficient motive; not merely from caprice, but the situation of his daughter was no longer that under which he made this imperfect disposition in her favor. In order to have any effect, he must have been compelled to give it effect, by suit in this court. This is not a case in which nothing was done, during the life of the party, showing an *alteration of intention.*"

We have been thus particular in stating this case, for the reason appellants' counsel relied upon it as decisive; he says it runs "*quatuor pedibus*" with the case at bar.

. We do not think the case is like this, in principle, and certainly not in the facts.

The grounds on which the Master of the Rolls decided this case, are found in the question he put: " Has a case ever occurred, in which a court of equity has interfered to give effect to an instrument attended with these *two* circumstances: 1st. no evidence that the parent ever parted with the possession of the instrument, and 2d. a *decided intention* by him *not to act upon that instrument, or to give effect to it,* having died with the conception that he was owner of the property which he, at one time, intended to give away."

If the case had not been attended with those *two* circumstances, is it to be supposed it would have been decided as it was decided ?    Did not the last named circumstance have great force in compelling the conclusion ?    Does it not figure in all the reasoning of the court ?    This case wants the second circumstance on which such stress is laid, and there is another feature in it, which Antrobus' case had not, and it is this :

The assignment in that case was not complete—it was executory, a mere agreement to assign, and the bill was filed to compel an assignment.    The prayer was, "that a proper assignment of the canal share may be executed."    In this case, the assignment to complainant was fully executed—the assignee accepted the trust, by writing addressed to the donor —the insurance company were notified of the transfer of the policy, and they noted it on their books.    The donor never revoked, if he had the power so to do, but died, to use the language of the Master of the Rolls with slight alteration, with the conception that, with the proceeds of the policy, his helpless children would be secured in a small pittance, when he no longer could contribute to their support.    The donor, at no time, declared any intention, or manifested any desire to retract, but the contrary.    He did, it is true, on the occasion of the oldest son arriving at age, inquire at the insurance office if the policy could be changed, and made for the benefit of the

132     OTIS *et al. v.* BECKWITH *et al.*     [Sept. T.,

Opinion of the Court.

two minors; but no change was made. The assignment, so far as the act of deceased could effect it, was executed—the assignee accepted the trust thereby created, and the debtor party was duly notified, and entered the fact on their books, but the policy and writing of assignment remained with the assignor up to the time of his death, and were found, attached together, among his valuable papers, by his administrator, after his death, who refuses, on demand made, to surrender it to the assignee, the complainant. This want of actual delivery to the assignee, is held, by appellants, as fatal to complainant's case. The general principle is admitted, that deeds take effect from their delivery and acceptance, and they must be mutual and concurrent acts, but the books are full of cases showing exceptions to this rule, as where a deed of land was made by a father, in favor of an illegitimate child of tender years, and placed on record by the father, this court held there was a delivery and acceptance. *Masterson* v. *Cheek,* 23 Ill. 72. And in Antrobus' case, the Master of the Rolls admits there were cases in which a voluntary conveyance, kept in possession of the party during his life, and in his possession at the time of his death, had been held to operate against his will, in which he disposed of the same property. Those were cases where there was a complete conveyance, a transfer in law of the property —nothing requisite to add to the validity of it—the instrument permitted to remain uncanceled. Yet, in those cases to which allusion is made, no delivery of the deeds was shown or pretended, but the contrary—they were not delivered.

In this case, the assignment was of a chose in action, which the law did not require should be recorded, but the debtor party had notice of the assignment, and entered the fact on the books of the company, and the assignee accepted the assignment, in writing. Was delivery of the policy to the assignee, essential to perfect the assignment? Was not the gift of this policy as complete as the nature of the thing and subject admitted? The policy was, in fact, assigned, and the

aid of the court was not invoked to compel an assignment. All had been done by the assignor that was incumbent on him to do. He notified the assignment to the assignee, and attached it to the policy, retaining both in his own possession. The facts of the case do not differ essentially from the facts in the case of *Fortescue* v. *Barnett*, 3 Mylne & Keen, 36.

In a note to sec. 433, 1 Story's Eq. Jur., that case is stated to be, a case of a voluntary assignment of a bond, and the bond not delivered, but kept in the possession of the assignor, it was held, a court of equity, in the administration of the assets of the assignor, would consider the bond as a debt due to the assignee, no further act remaining to be done by the assignor. The court say, there is a plain distinction between an assignment of stock, where the stock has not been transferred, and an assignment of a bond. In the former case, the material act (the transfer) remains to be done by the grantor, and nothing is, in fact, done, which will entitle the assignee to the aid of the court until the stock is transferred; whereas, the court will admit the assignee of a bond as a creditor.

Upon this ground, where A made a voluntary assignment of a policy upon his own life, to trustees for the benefit of his sister and her children if they should outlive him, and he delivered the deed of assignment to one of the trustees, but kept the policy in his own possession, and afterwards surrendered the policy to the office for a valuable consideration, and a bill was brought against A by the surviving trustee in the deed, to have the policy replaced, it was decreed accordingly. The court said, that the gift of the policy was complete, without a delivery; that no act remained to be done by the grantor to complete the title of the trustees, and, therefore, it was not a case where the court was called upon to assist a volunteer. This case differs from the one under consideration, only in this, that in the case reported, the assignment of the policy was delivered to the assignee, the policy remaining with the donor. Here, the assignment was not, in fact, delivered, but

equivalent acts were done by the donor and assignee, the one notifying the assignee of the assignment and trust, and his written acceptance thereof, and notice to the insurance company, which was noted on their books.

The general principle, advanced in the books, that a court of equity will not enforce a voluntary contract, is to be understood with proper qualification, for they abound in cases where such a contract has been enforced. For example, if there be a voluntary contract *inter vivos*, and something remains to be done to give it effect, if it be a voluntary contract to transfer stock, and the stock is not transferred, a court of equity will not enforce the transfer. But if the stock is actually transferred, then a court of equity will enforce all the rights growing out of the transfer, against anybody. 2 Story's Eq. Jur. § 433. This is the nature of the cases of *Ellison* v. *Ellison*, 6 Vesey 662; *Coleman* v. *Sarvell*, 1 Vesey, 50; *Palantoft* v. *Palantoft*, 18 ib. 91, cited by appellants. Here, the policy was actually assigned, accepted in writing, and noted on the books of the company, all which we regard as equivalent to an actual delivery of the assignment to the complainant.

In the same treatise, Justice Story, in treating of the "delivering up of instruments," in sec. 705, gives some examples where the instrument was not delivered during the lifetime of the party executing it, but was enforced by decree. Where a nephew gave a note to his uncle, for a sum of money, and afterwards the uncle wrote the following entry, " H. J. P. (the nephew) pays no interest, nor shall I even take the principal unless greatly distressed," and upon his death, the creditors found the entry, it was held a good discharge of the note at law. *Aston* v. *Pye*, 5 Vesey, 350. So, where a son-in-law was indebted to his father-in-law, on several bonds, and by his will the latter left him a legacy, and from some memoranda of the testator, it was satisfactorily shown that the testator did not intend that these bonds should be enforced by the executors, it was decreed that they should not be the subject of any

demand by the executors against the son-in-law, *Eden* v. *Smyth*, ib. 340 ; and to the same effect is *Flowers* v. *Masters*, 2 Mylne and Craig, 459. Another instance is given, where a testator, on his death-bed, said to his executrix, that he had the bond of B, but when he died, B should have it, and that he should not be asked or troubled for it. The executrix, after the testator's death, put the bond in suit, and thereupon B brought a bill for a discovery and delivery up and cancellation of the bond, and it was decreed accordingly, at the hearing, by the Lord Chancellor, and his decree was affirmed by the House of Lords. *Wekett* v. *Roby*, 3 Bro. Parl. Cases, 16.

In neither of these cases was there any valuable consideration for the promise, nor any delivery of such writing as was made, and in one case, the last, the gift was by parol. The grounds of the decision, manifestly, were, that the intention was fully established by the evidence; and in nearly all the cases cited, on both sides of this case, it will be perceived, from *Antrobus* v. *Smith*, decided in 1806, to the later cases, that the intention of the parties is an important consideration, and, in fact, a controling element.

Suppose the intestate, in this case, on his death-bed, had directed his administrator to hand over the policy for the benefit of his three sons, to complainant, on the authority of the last cited case, a court of equity would have enforced the request. It by no means follows, judging from these cases, that there must be a delivery of the instrument on which a right is based, or a valuable consideration, if the intention of the party can be plainly perceived. That, the court, in the absence of fraud, will carry into full effect.

Can there be any doubt of the intention of the intestate in this case? And was not the object he sought to accomplish by the assignment of the policy, one pure and holy, commending itself to the right reason and sense of justice of every one? Equity, discarding unmeaning and useless forms, will look to the substance of the act done, and the intention with

which it was done, and carry out the intention.  A delivery of the assignment to complainant, at the time it was made, was not necessary for any then existing purpose, as the policy was inert and unproductive during the life of the assured, and when, on his death, it became important the assignee should have the policy, in order to recover the proceeds of the company the evident and unquestioned intention of the donor is frustrated by his administrator, and that which he intended as a provision for his orphan children is sought to be appropriated as assets of the estate.   There is neither justice nor equity in this, the intention being so manifest in the other direction.

We have examined the case, thus far, with reference alone to the acts and intention of the intestate, and from them we are satisfied that he did all that was expected for him to do, in order to complete the transfer of the policy, and he kept the gift alive by paying the premiums, the last one in advance, and died under the conviction he had provided for his orphan children.

But the case is presented in another aspect by appellee's counsel.  They take the ground, that the acts done which we have commented upon, amount to a valid and complete declaration of trust, which equity will enforce against the estate of the donor for the benefit of the *cestui que trust.*

This phase of the case has been presented with great ability by counsel on both sides, and numerous authorities cited, which we have fully examined.  As appellee's counsel place great stress upon one of them, as of controling force, we have contented ourselves with the study of that case.  It is the case of *Kekewich* v. *Manning*, 1 DeGex, McNaughton and Gordon, 176.   It was decided in 1851, by the Lord Justice of the Court of Appeals, and reported by Mr. DeGex, the opinion by the Lord Justice KNIGHT BRUCE.  It is unnecessary to state very fully the particulars of the case, as they are manifold, and the points in it can be well understood without their being stated in detail.

In 1834, a sum of £10,500, 3½ per cent. bank annuities, and a sum of £500 per annum, Long annuities, were standing in the joint names of Mrs. Elizabeth Kekewich, and her daughter Susanna, in the books of the bank of England. The property was derived, immediately, from Robert Kekewich, the deceased husband of Elizabeth, and the father of Susanna. Under his will, these persons held these sums, as trustees, for their own benefit, for Mrs. Kekewich, for life, and subject thereto, for the absolute benefit of Miss Susanna. Having, between them, the whole beneficial, as well as legal interest in the property, Miss Susanna, having obtained her majority, agreed to marry Sir Henry Maturin Farrington, and in contemplation of the marriage, executed a deed of settlement, dated February 1, 1834, in which Sir Henry joined. Soon after the execution of this instrument, the intended marriage was solemnized. Sir Henry died soon after, having no issue by the marriage. Mrs. Kekewich was not a party to the deed, but cotemporaneously with it, she had notice of it. She survived Sir Henry several years, and died shortly before the institution of this suit. Upon her death, the legal title to the bank annuities, vested, by survivorship in Lady Farrington solely, and so continued. But, between the deaths of Sir Henry and Kekewich, certain trusts of the bank annuities were, for a valuable consideration, created by Lady Farrington so far as she could, and declared by her, which are at variance with the trusts of the settlement of 1834, and opposed to them, and the question in the cause was, whether against the present wishes of Lady Farrington, who now desired to resist and defeat the settlement of 1834, that settlement ought to stand and prevail, the legal title having, continually and uniformly, remained as it was when the settlement of 1834 was made, and the dealings of Lady Farrington with the property having had effect, if at all, only as to the equitable title.

18—49TH ILL.

To perceive, more clearly, the point of the question, it is necessary to state the settlement of 1834.

The three per cents and the Long annuities were, by the deed, transferred to those trustees, subject to the life interest of Mrs. Kekewich, upon certain trusts, for the benefit of Susanna, until her intended marriage should be solemnized. The trusts, after the marriage, were for Susanna for her life, for her separate use, and after her demise, as to the £500 Long annuities, in trust for Sir Henry Farrington for his life, and after the decease of the survivor, as to the whole of the trust funds, upon such trusts as Elizabeth Bradney (who was a neice of Susanna), and the children of the intended marriage, and for the issue of Elizabeth Bradney, and for the issue of the children of the intended marriage, as Susanna Kekewich should appoint, and in default of appointment, for Elizabeth Bradney and such children equally, as tenants in common. Provision was made in case there were no children of the marriage, that £5,000 of the stock, upon the death of Susanna, should be held in trust for Elizabeth Frances Bradney, for her own benefit, and become vested in her, on her attaining the age of 21, but not to be transferable until after Susanna's death.

In 1838, Lady Farrington married a Mr. Manning, in contemplation of which, another settlement was made, dated in June, 1838, whereby the stock and Long annuities were assigned by Lady Farrington to George Manning and another, upon trusts, after the demise of Lady F., for such of them, Elizabeth Frances Bradney and the children of the second marriage as Lady F. should, by will, appoint, and in default of appointment, for the children of the marriage equally, and if there should be no such children, as to £5,000 stock, part of the £10,500 stock in trust for Elizabeth Frances Bradney, if she should survive Lady Farrington. There was one child the issue of the second marriage. The second husband died in

1844, and Mrs. Kekewich, the widow of the testator, died in 1847.

The bill was filed by the trustees of the settlement of 1834, and John Bailward and Elizabeth Frances Bradney, his wife, against Lady Farrington, the trustee of the settlement of June, 1838, and the child of the second marriage, praying that Lady F. might be ordered to transfer the stock, or £5,000 part thereof, and the Long annuities, into the names of the trustees of the settlement of 1834, upon the trusts therein expressed, and that the same might be executed under the direction of the court, and that Lady F. might be restrained from transferring the said fund into the names of the trustees of the second settlement, or of any persons other than the plaintiffs.

The defendants insisted upon the power of Lady Farrington to make the second settlement, notwithstanding the existence of the deed of February, 1834, and they claimed under the second settlement accordingly.

The vice-chancellor dismissed the bill with costs, and on appeal to the Lord Justices, it was argued for the appellants, as it is here by the appellees, that even if the trust in the deed of February, 1834, was voluntary, still it was a complete gift, since everything was done of which the subject was susceptible, and to hold the gift to be ineffectual, would be to say, that an instrument of that description could not be assigned, except for value. On this point, reference was made to a large number of authorities : 2 Keen, 123 ; 1 Keen, 551 ; 3 Beavan, 238 ; 3 Mylne & Kean, 36 ; *Ex parte Pye*, 18 Vesey, 148 ; 4 Beavan, 600 ; 6 Vesey, 663, and Sug. on Ven. and Pur. 1,119.

The appellees contended, that appellants were volunteers, and the court could not assist a volunteer, if the gift is not complete, and anything remains to be done, and that the transaction was imperfect—there was no declaration of trust, nor was the legal estate in the appellants—they were obliged to come to a court of equity to enforce the assignment. The

140     Otis *et al.* v. Beckwith *et al.*    [Sept. T.,

Opinion of the Court.

settlement is not, in form or substance, a declaration of trust, it is an assignment—the court will not convert an imperfect gift into a trust, citing *Halloway* v. *Headington,* 8 Simon, 328 ; *Antrobus* v. *Smith,* 12 Vesey, 39 ; *Edwards* v. *Jones,* 1 Mylne & Craig, 226, cited by appellants here, and other cases.

The prominent fact in the case is, that Elizabeth Bradney was not a party to either of the settlements, and the provision in the deed of settlement of Feb., 1834, was wholly voluntary on the part of Miss Kekewich, and without any valuable consideration. It was for these reasons the vice-chancellor dismissed the bill.

The Lords Justice, on appeal, reviewed by the Lord Justice Knight Bruce, the cases cited by appellant here, and commented on them.

The learned Justice, after stating the grounds of the plaintiffs' claim, and in what right they sue, says : " The defendants resist the claim on the ground that, as the defendants insist, the provision, purporting to be made for Mrs. Bailward (Elizabeth Frances Bradney), by the deed of 1834, was one merely of a voluntary kind, was nothing more than an intended, or promised, gift, not perfected, not completed, and ought, therefore, not to be enforced, either at her instance, or at that of the trustees of the deed, by a court of equity. They contend, in terms, that neither Lady Farrington nor her mother, ever became a trustee of the funds for the purposes of the settlement, or at least, for the benefit, to any extent or in any event, of Mrs. Bailward. After reviewing the several clauses in the deed of 1834, the court concluded : " We consider the plaintiffs entitled to a decree." But it was on the assumption the court was not precluded by authority, from acting on their own opinion of what was right. They then review the authorities cited by appellants here, and say : " We dispose of the cause on the authority of *Ellison* v. *Ellison,* 6 Vesey, 656 ; upon *Cadogan* v. *Sloan,* Sug. Ven. & Pur. 1,119, and

upon principle chiefly, but secondarily also upon *Fortescue* v. *Bennett*, 3 Mylne & Keen, 36 ; *Wheatly* v. *Pim*, 1 Keen, 551, and *Blakely* v. *Brady*, 2 Drury & Walsh, 311, in the plaintiff's favor." The most of these cases are cited by appellants here, in support of an antagonistic view of the case. The appellees here are in the position of appellants before the Lord Justices on appeal, and all that is determined in their favor is favorable to these appellees, and supports their view of the case.

This case reviews all the learning contained in the many cases referred to by the appellants, and we cannot but express some surprise that there should be such variety of opinions on the questions discussed, and we may say, conflicting opinions. They are not all reconcilable. The last case commented on, *Kekewich* v. *Manning*, we are willing to take as the latest and best exposition of a subject, which seems to have perplexed the courts of England, and which may not, even now be considered as fully settled.

We place the most stress upon the first point discussed, and that is, the intention of the donor. He created the fund, apparently for the benefit of his motherless children, he did all in his power to confer upon the trustee the necessary authority to receive this fund for those children, when he should be no more; he was prompt in keeping the policy alive, by the payment of the premiums; at no time did he manifest any desire to retract, and though he occupied *locus pœnitentiœ*, he did not repent of his act, but left the world with the conception that those so dear to him had been provided for.

We see nothing in the case to justify us in frustrating this intention, but every consideration impelling to give it full force and effect.

The decree of the circuit court is affirmed.

*Decree affirmed.*