In re Estate of William Moore, Deceased.
Claude H. Moore et al., Plaintiffs in Error, v. Anna H. Moore, Defendant in Error.

Gen. No. 7,789.

1. APPEAL AND ERROR—*effect of previous decisions of same case.* On review upon writ of error of a judgment of the circuit court affirming a finding of the probate court, no peculiar force can be attached to the circumstance that two courts have passed upon the case where the circuit court decided it upon the record and therefore possessed no advantage not had by the Appellate Court.

2. GIFTS—*proof of gift of corporate stock where certificate retained by donor.* A gift of corporation stock during the lifetime of testator to his wife was shown though the certificates were found in his safety deposit box after his death and his will recited that he had given her 100 shares where it appeared that after the will was written the other shares, which were stock increase shares, were issued directly to her or through transfers by him on the books of the corporation, those issued directly to her being receipted for her by him as her agent; that cash dividends were paid to her; that she never attended stockholders' meetings but he always represented her as her proxy by her written authority; and that when approached concerning the sale of some of the stock he said he was merely talking for his wife and that anything decided on would be subject to her approval.

3. GIFTS—*proof of gift of corporate stock.* A gift of corporation stock from husband to wife was established where it was shown that the certificates were found in her safety deposit box at the time of his death; that he became a stockholder when the com-

Moore v. Moore, 237 Ill. App. 190.

pany was organized and later subscribed for additional stock; that he was a director until the date he transferred, on the books of the company, all of his stock to her, she then being present and new certificates being issued to her, which remained in her name until after his death, they being receipted for on the stock books in her own hand; that he said at that time he wanted her to have that stock because she was interested in it on account of her brother being president of the corporation; that he asked to have her made a director, which was done; and that thereafter he took no part in the meetings of the company and all dividends were thereafter paid to her as shown by the dividend checks.

4. GIFTS—*when gift of proceeds of checks shown.* The proceeds of checks were the property of the widow of testator by gift from testator and were not required to be inventoried by her as executrix of his will as part of his estate where they were issued to testator by the corporation of which he was president and by him indorsed and then delivered to his wife who deposited one of them in her account and gave to the company her personal checks for the others, receiving the company's notes therefor.

5. GIFTS—*proof of gift of proceeds of government bonds.* Title to the proceeds of government bonds was shown to be in the widow of testator where he directed the treasurer of the corporation of which he was president to take them to a certain brokerage firm, sell them and take a check in such treasurer's name; that when this was done he directed that the check be indorsed and put in the corporation's funds and a note of the corporation issued for the amount payable to the order of such treasurer; that he then directed such treasurer to indorse the note payable to the order of testator's wife; and that when this was done the note was delivered to testator and by him to his wife.

6. HUSBAND AND WIFE—*right of husband and wife to make gifts between themselves.* Since the passage of the married women's act husband and wife may freely make gifts to each other and they will be enforced at law as though the marriage relation did not exist, except for the restriction as to the rights of creditors contained in Cahill's St. ch. 68, secs. 1, 9.

7. GIFTS—*sufficiency of delivery of corporate stock certificates.* There was a good delivery with donative intent of corporate stock certificates by the donor where their transfer had been made by testator long before his death and they were kept in a safety deposit box used by both testator and his wife and she procured them from the box as his administratrix after his death, along with other papers.

Error by plaintiffs to the Circuit Court of Vermilion county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding. Heard in this court at the October term, 1924. Affirmed. Opinion filed March

6, 1925.  *Certiorari* denied by Supreme Court (making opinion final).

COMBS & LAYMON, WILS DAVIS and REARICK & MEEKS, for plaintiffs in error.

JONES, MCINTIRE & JONES, for defendant in error.

MR. JUSTICE CROW delivered the opinion of the court.

William Moore died testate November 17, 1921. He resided at Hoopeston, in Vermilion County. He was nearly 80 years old, and had been a successful business man, accumulating wealth, consisting of stocks, bonds and real estate. He was married twice, by his first wife having three children, Claude H. Moore, Cora M. Haynes and Winfield S. Moore. By his second wife, to whom he had been married 29 years, no children were born. Winfield died in 1918 leaving a widow and children. Claude died since the beginning of this litigation.

At his death, and some time before, he had a safety deposit box in the First National Bank at Hoopeston. His will was found in the box after his death. It was executed February 16, 1916. In it he recited he had already given to his wife his homestead and 100 shares of the capital stock of the Illinois Canning Company. By the will he gave her 100 shares of the H-O Company stock, 1 share of Federal Life Insurance stock, 6,162 shares of Union Securities Company stock, and household and personal effects, with exceptions not now material. To Claude H. Moore, residing at Memphis, Tenn., he gave 50 shares of the Canning Company stock, and 4,320 shares of Union Securities stock. To Winfield S. Moore he gave 100 shares of Canning Company stock and 4,320 shares of Union Securities stock. To a brother he gave 50 shares of stock in the Gibson Canning Company; to a niece, Ruth McNeal, 50 shares of Gibson Canning stock, 4,104 shares of Union Securities and 37 shares of H-O stock; to a sis-

ter, Sarah Osborn, 50 shares of Gibson Canning stock.

The will recites a joint interest with one Troge in a judgment for $113,490.67 and directs Troge, as trustee, to pay $25,000 outstanding indebtedness, pay to Winfield, his son, $5,000, and if there be a residue it should be paid to his wife, Anna H. Moore. It also directed the winding up of the lumber business at Memphis, in which he was interested with McFerrin, and constituted his wife and son, Claude, trustees for that purpose, giving to her, during her life, one-fourth of the net annual income from the lands and a like quantity to the three children, the fee in lands being bequeathed to the three children. Mrs. Moore, by the terms of the will, was to have $200 per month during the closing out of the business of Moore and McFerrin for not exceeding three years. It also provided that if the Moore and McFerrin business was converted into money, she should have the income during her life upon one-fourth the funds so derived. Mrs. Moore and Claude were appointed executors and trustees without bond. The will was duly admitted to probate and Mrs. Moore qualified and entered upon her duties as executrix.

As executrix she filed an inventory of property belonging to the estate. She did not inventory as assets of the estate the items now in controversy. Thereupon Claude H. Moore and Cora M. Haynes filed a sworn petition under the statute asking for an order directing her to inventory certain items not inventoried, as belonging to the estate. These items are: Certificates of shares of stock in Illinois Canning Company, par value $139,500; certificates of shares in Union Securities Company, par value $23,226; cash proceeds of undated checks drawn by the Canning Company payable to the order of William Moore, $4,330.30, received by Anna Moore at or about the time of the death of William Moore; cash proceeds of the sale of government bonds, $5,719.69. Another

item claimed, 10 shares, par value $1,000, in Aldrich Publishing Company, was abandoned.

A hearing was had on the petition in the probate court which found for the respondent, dismissed the petition and adjudged the costs to the petitioners. An appeal was taken to the circuit court, and by stipulation heard upon the stenographic report of the evidence taken in the probate court. A like order was there entered and to reverse it a writ of error has been prosecuted to this court. Petitioners contended and now contend the property was that of decedent. Respondent's contention is it is hers by gift from her husband.

There is little, if any, real controversy as to the evidentiary facts. The controversy grows out of the differing conclusions from these facts and the law applied to them leading to the ultimate conclusion. No peculiar force can be attached to the circumstance that two courts have passed upon the case. The circuit court, as we must, decided it upon the record. It possessed no advantage we do not possess.

( A gift is a thing bestowed gratuitously.) There is no element of unexecuted contract involved in it. No words are necessary to create the relation of donor and donee, the parties to the transaction. It is necessary, under the legal rules governing gifts, only that the intention to give and the intention to accept must in some intelligible manner be manifested. The common manner of expressing the process is, there must be a delivery and acceptance of the subject of the gift. Much discussion of that element has found a place in the decided case. It has occupied the foreground of discussion in all of them to a greater or less extent. In some it is said there was no intention to give because there was no sufficient delivery of the thing given. In others it has been solemnly argued the delivery did not disclose an intention to make a gift. In some of the cases it is said the donor must part with

dominion over the subject of the gift. But this statement affords no aid to a conclusion, for if a gift is established the power of control, the *right* of uncontrolled possession, use and disposal of the subject of gift has passed to the donee from the donor. *Devol v. Dye,* 123 Ind. 321. Such control is a necessary attribute of dominion. Bouvier's Law Dictionary (Rawley's Third Revision) *"Dominium"*; Black's Law Dictionary "Dominion."

These observations deduced from a consideration of many cases confirm the proposition that to establish a gift the intention to give and to accept the gift are the essential elements for the solution in every controversy involving the subject of gifts and that there is no fixed method or process for its solution, except this: what was done, what were the circumstances, and what was the conduct of the parties toward the entire transaction indicating their intention. *Otis v. Beckwith,* 49 Ill. 121, a gift of an insurance policy, the policy remaining in possession of the donor. *Weaver v. Weaver,* 182 Ill. 287; *Hoyt v. Northup,* 256 Ill. 604 (608); *Hill v. Kreiger,* 250 Ill. 408; *Weber v. Christen,* 121 Ill. 91. These cases bear particularly upon proof of the element of delivery. If the conduct of competent parties is consistent with the necessary intention to pass and accept title, and inconsistent with any other reasonably assignable theory, though coupled with no words, a gift is established. We think this a fair general statement of the rules and legal principles applicable in the examination of the facts in all cases in this State involving gifts. With regard to the decided cases in other states, there is utter lack of harmony among them, even upon the same or closely similar states of facts. A study of the subject and of the different elements of a gift and the deductions from facts, found in the monograph by Thornton, Gifts and Advancements, shows a given state of facts leads to one conclusion and a substantially like state of facts has been made the basis of

the opposite conclusion, depending upon the peculiar views of the court deciding the case. The author's footnotes to the book referred to show that like facts and circumstances often conducted different courts to opposite conclusions in an almost equal number of cases. That condition of authority suggests the propriety of extreme caution in the use of cases decided by the courts of sister states, unless the course of decision in those courts is in harmony with our own.

The first prayer of the petition filed by the distributees of the estate of decedent was that the executrix be required to file a supplemental inventory of 28 certificates of stock covering 1,395 shares of the capital stock of the Illinois Canning Company standing in the name of Anna H. Moore, found in the possession of William Moore in his safety deposit box in the First National Bank of Hoopeston at the time of his death, of the par value of $139,500 and owned by decedent at his death.

The allegations of petitioners cast upon them the burden of proof. The executrix could not be required to inventory any of the items unless they were shown to be the property of the testator at his death. The burden began with them and continued throughout the trial on their demand that she be required to inventory the different items because they belonged to testator at his death. We think they failed to maintain the averment. Every circumstance and the conduct of both parties from the time she became of record a stockholder until the death of her husband is not only consistent with her title, and his lack of title, but is inconsistent with any other conclusion. These are the conditions giving cogency to proof by circumstantial evidence. 28 Corpus Juris, sec. 82. It is a common method of proof of the element of delivery. The executed and an unexecuted will of decedent were put in evidence by petitioners. Both recite he had given her 100 shares of the stock and the inference sought to

be drawn therefrom is that he owned the remainder
and, as a corollary, the petitioners should have it as
residuary legatees for it was not otherwise disposed
of. There is nothing militant in the recital of the will
of William Moore, dated February 16, 1916, as
against her title to other shares of stock in the Can-
ning Company than the 100 shares he says he had
given her. In the second, the unexecuted will, he
makes the same recital. That might have been one of
the reasons for not executing it. It bore the date line
"——day of June, 1918." Yet the undisputed and in-
controvertible record evidence is that while at the date
of the first will there was standing on the books of the
Canning Company only 100 of the original shares in
her name, in June, 1918, 375 shares of such stock,
transferred of record to her by Mr. Moore, were in
her name. In addition to the original stock, at that
time there were 600 shares of stock increase issued
immediately to her or mediately through transfers by
him on the books of the corporation. The transfers of
increase shares, both series, were made January 1,
1918. December 30, 1920, 595 shares of the third in-
crease stock were issued by the corporation directly
to her. Of the first stock increase issued directly to
her, the certificates 48 and 49 therefor were receipted
on the stock certificate stub "Anna H. Moore by Wil-
liam Moore, Agent." Certificates 74 and 75, of the
second stock increase, were receipted in the same
manner. Of the third stock increase only 5 shares
were issued to him. Cash dividends were paid to her
at different times as they were to Mr. Moore and to
his children on their stock. In tracing the title to the
stock from the one to whom it was originally issued
through the different transfers to the present claim-
ant, we have not regarded so much the minutiæ in
the number of shares transferred as the substance of
the transactions.

Not only do the stock transfer books show the trans-

fers to her and the intervention of the decedent as her agent in effecting them, but the evidence shows she never attended stockholders' meetings, Mr. Moore voting her stock as her proxy by her written authority. Two of the proxies, one dated December 24, 1920, the other January 14, 1920, are in evidence. The others were lost. The undisputed evidence is, he always represented her at stockholders' meetings as her proxy. In 1920 Miskemens, secretary of the corporation, talked to the decedent and attempted to buy some stock. Moore told him that in making a price and in selling the stock he was merely talking for Mrs. Moore and that anything decided on would be subject to her approval, for it was her stock, and he was simply acting as her agent. Not only did he at all times recognize her as the owner, but the corporation while he was president paid dividends directly to her and wrote letters to her recognizing her as the owner of the stock. In all this he acquiesced and acted as her agent for the furtherance of her ownership and its exercise. These acts of recognition during the time there was no controversy as to the title were parts of the *res gestæ,* verbal acts, things done concomitant with her assertion of ownership, as against the world, as the natural expression and recognition of ownership at a time when there was no motive to act or speak otherwise than truthfully. This is peculiarly applicable here, for the petitioners, children of the decedent, stand as against her in no better position as owners than he stood. "They stand in his shoes." They, attempting to trace title through him are, as he was, bound. His estoppels operate against them. The donor had no right to control the stock and everything he did was a recognition of the fact. Any attempted control would have been an intrusion upon Mrs. Moore's clearly established ownership. This he studiously and faithfully avoided. Those claiming through him are bound to like fidelity.

The second items in controversy are: "Certificates

covering 23,226 shares of Union Securities Co., a corporation, standing in the name of Anna H. Moore, and found in her safety box, at the time of the death of William Moore (par value $23,226) which in fact were owned by said decedent at his death.''

The title to this stock is established by the testimony of Isaac Miller Hamilton, a brother of Mrs. Moore, and by the records of the corporation. He has been president of the Union Securities Company since its organization in 1904. Mr. Moore became a stockholder at the time of its organization, subscribing for 17,064 shares represented by 4 certificates. In 1905 he subscribed for 6,162 additional, a total of 23,226 shares. From its organization to March 20, 1918, he was a director. On that day he transferred on the books of the company all of his stock to Mrs. Moore, new certificates being issued to her. She was present at the time. From then until the hearing in the probate court the stock was standing in her name. She receipted for the certificates on the stock books with her own hand. He said at the time he "wanted Anna to have this stock because she was interested in it" on her brother's account and wanted her to have the Illinois Canning Company stock and wanted his children to have the Southern property as they lived in the south. He asked to have her made director in the Union Securities Company and that was done. After the transfer of the stock he took no part in the meetings of the company and all dividends were paid to her thereafter as shown by the dividend checks. This evidence is uncontradicted by any witness or by any circumstance. It is corroborated by everything done as shown by the records. It is sufficient to satisfy the most exacting insistence upon all the elements of a gift. We deem it of much significance that this transfer was made almost contemporaneously with the transfer to her of the Canning Company stock, forming part of a general plan.

The third item of the claim in controversy is:

"Cash proceeds of four undated checks drawn by Illinois Canning Company, payable to the order of William Moore, aggregating $4,330.30, which money was received by Anna H. Moore, at or about the time of the death of said William Moore, which in fact belonged to said decedent."

The origin and devolution of the title to these items are testified to by Earl M. Webster, treasurer of the Illinois Canning Company, corroborated by the records of the corporation. He had occupied that position for twelve years at the time of the hearing. He testified the four undated checks aggregating $4,330.30 were issued at the direction of Mr. Moore, who was president and general manager of the company. Mr. Moore directed him to draw checks for his salary for the months of November and December, 1921, being $1,041.65 per month. To cover the two months' salary four checks were drawn, two for $500 each and two for $541.65 each. They anticipated his salary. They were all issued November 8, 1921, and after being delivered to him he indorsed each of them. Three of the checks so indorsed were delivered by him to Mrs. Moore at the time of their indorsement. One for $500 was delivered to Ruth McNeal. A check for $2,750, dated October 28, 1921, was made by direction of decedent and payable like the others, and delivered by him to Mrs. Moore. The witness does not remember whether Mrs. Moore was at home or at the office when the last-mentioned check was drawn but the next day the company received Mrs. Moore's personal check for $2,750, for which it issued to her its note. Mrs. Moore gave to the company her personal check for the two salary checks $1,041.65, and for that it gave her its note. She deposited to her account the remaining check for $541.65. All the company checks so drawn were paid on Mrs. Moore's order in due course.

The final item with which petitioners seek to have

the executrix charged is: "Cash proceeds of the sale of government bonds in the sum of $5,719.69, converted by someone while decedent was on his death bed and turned over to the Canning Company, who gave a promissory note believed to have been endorsed over to Anna H. Moore, which bonds and proceeds and note belonged to decedent at his death."

The transaction through which the title to the proceeds of the government bonds is derived was had by Webster at the request of decedent. The details of it are told in a clear and convincing manner. It is not improper to say here that a most painstaking examination of the record in this case fails to reveal any discrepancy or anything unreasonable in his testimony as to any matter about which he testified. The judge of the probate court heard him testify, saw his demeanor while testifying, and believed him. He had an advantage we do not have and we must therefore believe him, he being corroborated and unimpeached. For twelve years occupying the responsible position of treasurer of a well-known industry doing a prosperous business, intimately associated with one who no doubt contributed by his sturdy character and sagacity to its success, it is not strange that, of all others, he should have been called by that one to go on business errands of importance. Mr. Moore had the bonds. No doubt, as a sound business man, a man of practical affairs, he had a premonition of impending dissolution. Fourscore years full of experience most likely led him to the conclusion, one reached by practical men every day, that the transfer and disposition of his accumulated wealth during life would probably avoid an expensive and disagreeable controversy after death. They were his bonds. He had an undoubted right as an incident of ownership to dispose of them. There is no suggestion, nor any circumstance in evidence warranting a suggestion, he was mentally incompetent or that he did not recognize the

objects of his bounty and know the subject of dispo-
sition.   The bonds might have been passed by other
methods known to the law.   But the method he se-
lected was to have them converted into cash and that
into easily disposable evidence of their value.   This
was his way and there is nothing of evil suggestion
about it.

To that end he placed the bonds in Webster's hands
with specific directions to take them to a designated
brokerage firm in Chicago, sell them and take therefor
a check in his, Webster's, name.   Webster did as di-
rected.   The check being presented together with a
statement of the broker for the proceeds of the con-
verted bonds, he was directed by Mr. Moore to indorse
it, put it in the Illinois Canning Company funds and
issue a note of the company for the amount, payable
to his, Webster's, order.   This being done, the note
was taken to Mr. Moore and the witness says: "He
asked me to turn the note over and endorse it 'pay to
Anna H. Moore, without recourse,' which I did."
Having indorsed it as directed, he handed it to Mr.
Moore, and he to Mrs. Moore.   He could certainly
have done nothing that would more clearly indicate
a determination to liberate the property and pass it
to her, and that, under the law and according to the
etymologists, is delivery.

The foregoing review of the evidence shows that all
shares of stock once owned by decedent were trans-
ferred by him in the manner required by law to ac-
complish the transmission of title.   Uniform Stock
Transfer Act, Cahill's St. ch. 32, ¶ 229 *et seq.;* 28 Cor-
pus Juris, p. 658, sec. 59.   Nothing is suggested by
counsel for plaintiffs in error, nor are we aware of
anything, that could have been done that would more
perfectly demonstrate a renunciation of title on his
part.   The renunciation was for the sole purpose that
its acquisition should pass to and be in her whose title
is assailed.   In the most unmistakable manner his in-
tention was, as disclosed by his words, acts and uni-

form conduct with regard to all the property, to pass the title and all beneficial interest in the subject of the gifts to her. This is all the law requires.

Manual delivery being unnecessary, though the evidence of rights or of a beneficial interest be retained by the donor, if everything done is sufficient to show an intention to pass the right or beneficial interest represented by such evidence the gift is complete. This principle, applicable to the passing of the shares of stock, mere intangible interests or rights in corporations, is deduced from and illustrated by comparison of *Otis v. Beckwith*, 49 Ill. 121, with *Williams v. Chamberlain*, 165 Ill. 210. Both arose out of alleged gifts of insurance policies. In each the policy had been assigned but remained in the possession of the donor at his death. In each the assignee claimed the beneficial interest adversely to the administrator of the insured. They are identical in these respects and if nothing differentiated them the judgment would have been the same in both cases. But in the former the claimant was successful and in the latter not. The essential difference was, in the former, the *Otis* case, the assignment had been accepted by the insurer and the gift held complete; in the latter, the *Williams* case, it had not been so accepted and therefore the gift was held incomplete. In the first, the intention was held to be manifest to transfer the fruits, the beneficial interest in the insurance of which the policy was only an evidence, by procuring the acceptance. In the latter it was not manifest because acceptance was not procured. In this case, if Mr. Moore had the actual possession of the certificates of stock standing in Mrs. Moore's name, and so standing on the books of the company by his procurement and acquiescence, the beneficial interest of which they were only an evidence was in her because he had indubitably manifested the intention it should be so. Those interests, *qua* interests, were incapable of better delivery.

This is a much stronger case for appellee than that for the donee in *Davis v. Zimmerman,* 40 Mich. 24, to which we refer because of the reasons for the opinion and the distinguished jurist pronouncing it. It was a controversy between a wife and execution creditors of her husband as to the ownership of a horse and sleigh claimed by her as a gift. Judge Cooley said: "But it is no doubt true that in respect to the property in general there was no open and visible change of possession. But how could there be? The donor and donee were husband and wife, living together at a public hotel. Must she separate from him in order to be competent to receive from him a gift? If he gives her a picture or an article of furniture, must she procure it to be kept by someone else instead of placing it in her own apartment?"

It is not possible to devise a more effectual method of transferring government bonds than that adopted. He directed their conversion. His agent converted them, taking a check for the proceeds in his own name, and delivered the check to the donor. He directed their investment in the corporate notes of the Canning Company in the name of Webster, then directed the special indorsement of the note, without recourse, to Mrs. Moore. With his own hand he gave the note so indorsed into her hand. That was literally manual delivery and more than the law requires to constitute the gift. *Abernathie v. Rich,* 256 Ill. 166; *Hoyt v. Northup, supra.* The same business-like method was pursued with the other subjects of transfer at the home. No one claims that any of these items ever left the actual possession of the donor, nor that any of them ever afterward was in the hand or possession of the donor.

Counsel say, as to the transfer of the proceeds of the bonds, if Mr. Moore intended a gift of this money to his wife it might have been accomplished without any indirection. We are not permitted to look into or indulge in conjecture as to the donor's motive in the

disposition or manner of disposition of his property. The motive is immaterial. If he had procured the money derived from the bonds and delivered it directly to her, it is not difficult to understand her title to it might have been more precarious than when invested in a good negotiable note, indorsed specially to her. It bore distinctive marks of ownership. The money did not. By this means unimpeached testimony is corroborated in an unimpeachable manner unless fraud shall be presumed. We cannot presume it and there is an entire absence of evidence to support it. No one could successfully assert title to the note without forgery, unless the indorsee should have indorsed it. Even theft would not have deprived her of it.

The method pursued is in harmony with that employed by decedent in every transaction disclosed by this record. The photostatic copies of the various documents in evidence at the trials below, and certified to this court, constitute invulnerable proof of every link in the chain of respondent's title to all of the shares of stock in controversy, if the burden of proof were imposed on her. The transfer of the Union Securities stock and of the shares of stock in the Illinois Canning Company were accomplished directly by him in the same manner. In both there was scrupulous regard for all the legal formalities essential to the investiture of title in his wife. There was no intervention of an agent in those transactions. He directed in person the transfer of those stocks. As president of the corporation he signed the certificates. That it was sufficient to effect a change of title cannot consistently be challenged. If the argument from analogy and design is of any value the similarity of method, whether acting in person or by an agent under his express direction, evinces a uniform and undoubted purpose from 1910 to his death to transfer his property to his wife. He asserted no right to possession of any of the stocks after the transfers but on the contrary

paid homage by words and acts to her rights of possession and ownership. No inconsistency is pointed out and none exists that we have been able to discover.

In the brief of counsel for plaintiffs in error it is said: "A gift from husband to wife must be clearly proven. He must use words clearly indicating he has divested himself of all beneficial interest in the subject matter of the gift." An Encyclopedia of Law is cited in support of this proposition. [8 Amer. & Eng. Encyc. of Law (1st Ed.) 1333.] But by whatever cases the text may be supported, it does not comport with the law of this State. No words or form of words are necessary. *Weaver v. Weaver*, 182 Ill. 287. The law of this State since the married women's act is, husband and wife may freely make gifts to each other and they will be enforced at law as though the marriage relation does not exist. The only restriction is as to the rights of creditors. Cahill's St. ch. 68, secs. 1, 9. But that condition is not present in this case.

A case in equity arising before those acts and strongly analogous to this at bar, involving a gift, is *Gill v. Woods*, 81 Ill. 64. James Gill was married to Mrs. Sconce in 1853. At the time of the marriage she owned 80 acres of land in fee and a life estate in 40 acres as dower. A bill was filed by the administrator with the will annexed of Mrs. Gill against her surviving husband to compel him to pay and deliver over to the administrator certain moneys, notes and property claimed to belong to the estate of Mrs. Gill. The only question involved was whether the administrator was entitled to recover as the law then stood regulating the rights of property between husband and wife. The rents and profits of the land formed the subject matter of the moneys and notes involved in the suit, they being on account of and representing the accumulations of such rents and profits and interest thereon which under the law were the property of the hus-

band. During the marriage the parties kept their moneys and property entirely separate, the same being treated as distinct as though no marriage relation existed. The husband took charge and managed his wife's lands, always recognizing and treating the rents and profits as belonging to her. When he sold rents in kind he paid the money to her. She loaned the money on notes drawn by her husband, always made payable to her. He had possession of the notes. The rents of his lands were kept separate from hers, she claiming those from her land. The court say: "The evidence is full and explicit that appellant declined to avail himself of his marital right to claim the rents and profits of his wife's land, but consented that she should have them as her separate estate. The authorities abundantly show that under such circumstances these rents and profits of the wife's land during coverture became her separate estate in equity, and will be supported as such against the husband in equity." Quoting numerous authorities supporting the transaction as a gift enforceable in equity, the court further say: "The wife, here, died in 1871, leaving a will, and the contest is really between her devisees and the husband. Admitting the rents and profits of her land during coverture were the sole property of the husband, there was a gift of them to the wife. There was not merely the intention clearly expressed that the wife should have them, but the intention was executed—the gift was complete. The separation of the rents from the mass of appellant's property, by having the tenants of adjoining lands of appellant and his wife keep her rents separate for her use in a separate repository—the paying over to her, as her own, money which he received from the sale of the rents from her land—and his drawing the notes for the loans made by her from time to time of the moneys so derived, making the notes payable to her, were clear and distinct acts, by which he divested himself of the property and appropriated it to the sep-

arate use of his wife. It matters not, as we conceive it, that the notes he is decreed to deliver up are found in his possession. Such possession, like all his other acts and doings in the premises, must be held to be as agent for his wife." On another branch of the case the court say the evidence of a gift was not so clear, yet "there are here no rights of creditors concerned, and there is no pretense of any cover for fraud, and *we see no reason why the intention and acts of the husband should not have effect."* It is only necessary to observe that while equity alone then could protect a married woman's right when dealing with her husband, the law now amply protects them as if she were unmarried.

It is also said in the brief that without delivery there is only a contract to give which is void for want of consideration. We have so held at the present term of this court and sustained the judgment of a circuit court in so holding. But that is not the condition of this case. Here every intention to transfer title was manifested in the most unmistakable manner. *Millard v. Millard*, 221 Ill. 86, where there was a claim of a gift is cited and the concluding paragraph of the opinion quoted. In that case Winfield Scott Millard had a safety deposit box and in it a large amount of gold certificates, government bonds, railway bonds, some currency and a diamond stud and ring. Jane Millard claimed deceased took the gold certificates and some bonds and placed them in a compartment in the box and said they were hers. She testified that at the time he gave her a key to the box and the password but that she did not exercise nor attempt to exercise any acts of ownership over the alleged gift. In the meantime he had exercised the entire control over the property and part of the time it was not in the box. He cut coupons from the bonds, cashed them and deposited them in his account. He was ill some time before his death and could not leave his home. Part of the time he was mentally incompetent to transact

business. He made efforts to obtain the key from her but did not obtain it. After he died, the administratrix went to the box and found that everything had been taken away except such securities as would pass only by indorsement. The Supreme Court held there was no gift. The court say: "But if the conversations occurred as claimed, and the deceased was then capable of making a gift, his *statements* did not constitute a gift. So far as he knew, the property had not been taken by Jane H. Millard or delivered to her. He did not deliver it for he did not know that she had taken it and he had no part in the delivery. The conversations showed, if they showed anything, that he supposed the securities were still in the box. The gift was not completed by the acts of defendants in taking possession of what they found in the box not standing in the name of the deceased and which they could make use of, when such taking was without knowledge of the deceased." It was this state of case that the late Justice Cartwright was deciding when he used the language quoted in the brief of plaintiffs in error: "We do not think the defendants should be permitted to retain property acquired in a raid, in which they participated, on the safety deposit box, without the knowledge of its owner, and they should be required to surrender the proceeds."

We have stated the facts and quoted from the opinion to make manifest the entire absence of analogy between that case and this. Here, as there, decedent had a safety deposit box. Some of the contents were taken out of Mr. Moore's box but by his direction. Some were in his name and some in Mrs. Moore's name. The circumstances of the taking are that Mr. Moore called Webster to his home on November 12, 1921, gave him the key to his deposit box and told him to bring a bundle of papers that was in the box. Having procured the master key at the bank he took some papers to him wrapped in paper. Among the papers were the $6,000 of Liberty bonds and a note for $9,600

made by Laura Fraley to Mr. Moore. When the papers were brought to him he indorsed the Fraley note and handed it in an envelope to Cora M. Haynes, his daughter. It was at this time he directed Webster to convert the Liberty bonds as detailed, *supra.* The other papers were the Union Securities stock in Mrs. Moore's name, brought by mistake, which was handed to Mrs. Moore and not taken back to the bank. After the death of Mr. Moore, Claude H. Moore came to the home and got from Mrs. Moore the key to the safety deposit box at the First National Bank and searched for the will. He did not return the key to her but after the funeral went home, returning several days afterward. In the meantime Mrs. Moore not having access to the box at the First National Bank procured a box at another bank, being unable to get one at the former. In this box she placed her papers, among them the Union Securities stock. The certificates of the Canning Company stock, described *supra,* were in Mr. Moore's box. She took from it these certificates after Claude came back with the key and inventoried everything in it except the stock, the title to which we hold to be in her.

The examination of this feature of this case, characterized by plaintiffs in error as a "raid" on Mr. Moore's box, has been postponed to this place that it may be compared closely with the *Millard* case. Mrs. Moore kept her papers in Mr. Moore's box. The evidence shows that for several years she frequently went to the box, opened it, took from it notes, certificates of stock and other papers and indorsed interest payments. It is further shown that she had Miss Fraley indorse credits for her on documents taken from the box. Unlike the *Millard* case, the owner of the box knew she owned the papers in it and in every conceivable way recognized her ownership. Each had equal access to it. The delivery, established so clearly by the circumstances, was made to her of the tangible evidence of the right to intangible property, in-

terests in corporations. The delivery, the transfer, of those interests, was made long before, and if he had asserted title to the documents evidencing those interests adversely to her she would have been entitled upon this record to recover for the intrusion or defeat him in any demand made against her on an adverse claim. It must be true that her access to the box was by his consent, for through a series of years she used the key he used, by the aid of the master key at the bank, to obtain papers in her name. There is nothing that savors of discord between them. Everything points unerringly to a design to provide for the surviving companion of his old age.

Mrs. Moore testified at the hearing as to statements alleged to have been made by her against her interest. Her testimony was proper for that purpose. We do not review those statements, not considering them of any importance in the determination of the cause. It may be properly said, however, that all the circumstances corroborate her where she contradicts or is contradicted by other witnesses. We are of the opinion the conclusion of the courts below was right and the order of the circuit court is therefore affirmed.

*Affirmed.*