UNION TRUST COMPANY OF ROCHESTER, Respondent, *v.* WILLIAM W. BOARDMAN, as Administrator, etc., of HELEN HEALY OLMSTEAD, Deceased, and Others, Appellants, Impleaded with DANA W. KREIDLER and Others, Respondents, and JOHN G. KRAMER, as Administrator, etc., of DORUS HEALY, Deceased, and Others, Defendants.

Fourth Department, December 23, 1925.

Trusts — construction — trust instrument written by donor without aid of attorney provides that on death of one beneficiary his share shall be paid to such grandnephews and grandnieces " as are now living, and shall then be living "— grandniece born after creation of trust is not included — evidence — declarations of donor on question are competent — instrument cannot be reformed to correct alleged mistake in primary computation.

A trust instrument written by the donor without the aid of an attorney, which provides that on the death of one of the beneficiaries the principal representing his share shall be paid " to such of the grandnephews and grandnieces of first party, as are now living, and shall then be living, and to the children of any grandnephew or grandniece who may be not living in such manner that such children shall take the share that the parent would have taken if living," is construed not to include a grandniece born after the execution of the trust instrument and, therefore, such grandniece is not entitled to any share of the principal on the death of one of the beneficiaries.

On the question of the intention of the donor, it was competent to introduce declarations made by him tending to show the sense in which he used the words quoted and his intent in reference to that provision.

The trust instrument cannot be reformed as between the beneficiaries after the death of the donor on the theory that he made a mistake in primary computation of the share of certain grandnephews, thereby defeating his alleged apparent intention of making an equal distribution of the principal on the death of any beneficiary, for there is no question of ambiguity, and the instrument which was written by the donor himself clearly states the fractional part which he intended to give to said grandnephews.

HUBBS, P. J., and CLARK, J., dissent.

APPEAL by the defendants, William W. Boardman, as administrator, etc., and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 23d day of February, 1924, upon the decision of the court rendered after a trial at the Monroe Equity Term, and also from an order entered in said clerk's office on the 22d day of July, 1924, denying said defendants' motion for a new trial upon the ground of newly-discovered evidence.

*Kenefick, Cooke, Mitchell & Bass* [*Thomas R. Wheeler* of counsel], for the appellants William W. Boardman, as administrator, and others; *H. V. Pratt,* guardian *ad litem,* for the appellants Donald

Jenks and others; *Robert Pratt*, guardian *ad litem*, for the appellants Helen Boardman and others; [*Edward H. Letchworth, Fritz Fernow* and *Thomas F. Fanning* of counsel], for the appellants.

*Sutherland & Dwyer* [*Andrew R. Sutherland* of counsel], for the plaintiff, respondent.

*Robbins, Phillips & Robbins* [*Fred A. Robbins* of counsel], for the respondent Dana W. Kreidler.

*Clyde E. Shults*, for the respondent Leland Kreidler.

*Leonard B. Bacon*, guardian *ad litem*, for the respondent Marie Eliza Healy.

*H. V. Pratt*, guardian *ad litem*, for the respondents Laura Christine Kreidler and others.

DAVIS, J.    The action was brought by the trustee for approval of its accounts and to obtain interpretation of portions of a trust agreement made by Dorus Healy. Two defendants asked reformation of certain provisions of the instrument.

In 1918 Dorus Healy was eighty years of age. Though married he was childless. He had extensive property largely in the State of Michigan where he resided.

Having given the matter long and careful consideration Healy decided to create a trust from a portion of his property, giving the income to his nephews and nieces with remainder over to grandnephews and grandnieces. The fund to be thus dedicated for the trust aggregated about $435,000. He owned other property worth upwards of $600,000.

Healy was not a lawyer but was accustomed to draw his own conveyances and contracts. It appears that he gave some study to the law of this State relating to trusts and was familiar with the Statute against Perpetuities. (See Real Prop. Law, § 42; Pers. Prop. Law, § 11.) He then undertook without legal advice to draw the trust agreement.

The agreement, although dated November 22, was executed November 27, 1918. He named therein the plaintiff as trustee. In the main his purposes are clear. Some portions of the agreement are inartificially drawn and as deaths occurred amongst those entitled to income and these remainders vested the trustee has been in doubt as to the interpretation of some of its provisions, and has sought the aid of the court. Dorus Healy had died in September, 1921, prior to the commencement of this action.

We do not need to consider certain contemporaneous agreements made by the beneficiaries which in effect provided for the care and maintenance of Healy during his life. These were in the

nature of a life estate reserved to the donor. The reservations and agreements did not deprive the trust of its character as a gift to the beneficiaries. We do not understand that the claimants, who have succeeded in having their interpretation adopted by the court, now base any right to the fund upon a valuable consideration furnished by them.

The trust agreement provided in substance as follows: The principal was to be divided into eleven parts as a basis for determining the amount to be paid to the eleven nephews and nieces named in the instrument. Five and three thousand, three hundred and thirty-four ten-thousandths per cent of the principal was apportioned to Laura C. Kreidler, and the net income thereof was to be paid to her. The remaining principal was to be equally divided into portions representing the other ten nephews and nieces whose names were given. Each one living at the end of the fiscal year was entitled to receive his proportionate share of the net income produced. When a beneficiary died, the part of the principal fund apportioned to him was to be paid to " such of the grandnephews and grandnieces of first party, as are now living, and shall then be living, and to the children of any grandnephew or grandniece who may be not living in such manner that such children shall take the share that the parent would have taken if living and such transfers and payments of such portion of said principal fund shall be in the following proportions: To Leland Kreidler 2.6667% thereof; to Dana W. Kreidler 2.6667% thereof and the balance in equal shares to the other grandnephews and grandnieces aforesaid."

Two controversies have arisen between the beneficiaries: (1) The legal interpretation of the phrase " paid to such of the grandnephews and grandnieces of first party, as are now living; and shall then be living, and to the children of any grandnephew or grandniece who may be not living in such manner that such children shall take the share that the parent would have taken if living." (2) Whether there may be reformation of the instrument so that it may express an intent of the donor other than that he had written, because of a mistake made by him in computing the shares in the remainder of Leland and Dana W. Kreidler.

1. Byron J. Healy was one of the eleven nephews and nieces named in the instrument. Twelve grandnephews and grandnieces were living at the time the trust agreement was made. Marie Eliza Healy, a daughter of Byron J. Healy, was born August 24, 1920. Helen Healy Olmstead, a niece named in the agreement as a beneficiary, died June 8, 1921. This share was to be divided among remaindermen. On behalf of Marie Eliza Healy it is con-

tended that by the language in dispute, afterborn grandnephews and grandnieces were to share in the distribution of the principal thus released. In other words, it is claimed that the language " paid to such of the grandnephews and grandnieces of first party, as are now living, and shall then be living " contemplated payments not only to those living at the time of the execution of the instrument, but also to such as should be born before the time of the death of a nephew or niece. The appellants contend that the language limited the remaindermen to such as were living at the time of the date of the instrument, and who should still be living at the time of the distribution except that in the case of those who died leaving children, such children were to take their parent's share. Otherwise, the distribution was to be made *per capita* between existing grandnephews and grandnieces.

In interpreting the written language of a person to discover his intent relative to a disposition of his property taking effect after his death, where the person who signed the instrument may not speak to give further explanation of his use of language, the obvious method is, as we have said in another case, to attempt to install the judicial mind in the place and surroundings of the mind of the deceased person, and construe the instrument in the light of its own language and the surrounding circumstances, and in the common experiences of mankind (*Matter of Barney*, 207 App. Div. 25, 28; affd., 239 N. Y. 584), " with context and cognate gifts shedding light upon the meaning." (*Matter of Evans*, 234 N. Y. 42, 45.)

It is always a question of judgment to be exercised upon the facts existing in the particular case with no absolute certainty of reaching the right conclusion. The learned trial court held that the words in question expressed an intent that afterborn children should share in a distribution of the remainder. (See *Union Trust Co.* v. *Kramer*, 201 N. Y. Supp. 182.)

We take a different view and believe the donor intended to limit the distribution to those living at the time the instrument was executed, who should survive until the several times of distribution, except that if one originally entitled to share died having children, such children should take the parent's share. No extended discussion with refined distinctions as to the use of particular words or punctuation in the instrument would be of much aid in making clear the conclusion we have reached or furnish any valuable basis of reasoning. It is perhaps sufficient to say that the donor was giving only a portion of his property to persons whom he personally knew. These contingent remainders might vest in his lifetime or soon after his death and immediate distribution

would follow to those relatives he had seen and known. In his carefully studied plan there is no direct reference to after-born children. As to them, there could be no certainty as to the number or the time of birth. There would not be an equal distribution of the corpus of the estate among them, for it was likely that the whole or a part might be distributed before any, or at least some, of them were born. He was giving to those from whom he would receive present gratitude. He retained a large amount of property by means of which he could provide, if he desired, for any new objects of his bounty. The construction bringing in those not *in esse* seems strained. His intent very evidently was that if one of the grandnephews or grandnieces died childless before distribution, the remainder should not vest in the next of kin of this deceased person but would go to increase the share of the survivors. It was only the children of the contingent remaindermen who were entitled to take the parent's share. Other preliminary drafts of the agreement offered in evidence indicate the same purpose in different words. Inept as the phraseology may be, it indicates that the donor, an aged man, had in his mind persons then in being and was harassed by the fear that his instrument might offend the statute regulating the suspension of the power of alienation.

The construction we have adopted finds additional support in certain documents discovered subsequent to the trial and upon which the motion for a new trial is based. We regard the declarations of the donor on this subject competent as disclosing the sense in which the words were used by him and throwing light on his intent. (Wigm. Ev. § 2471.) If we were uncertain as to the proper interpretation as the evidence stands, a new trial might properly be granted.

2. May a court of equity grant reformation of the trust agreement between beneficiaries, after the donor's death, on the theory that his intended plan of distribution was defeated by an alleged mistake in computation?

As already stated, Laura C. Kreidler was given a specified share of the income and the remaining portion was equally divided between the other nephews and nieces. The reason therefor is that in 1913 Dorus Healy had given her a farm, the value of which he fixed at $18,000. He made certain agreements with her and her sons, Leland and Dana W., that this gift should be treated as an advancement if he died intestate. At that time evidently he did not contemplate making the trust agreement. When it was made he deducted $18,000 from the principal sum apportioned to Laura. In the distribution of remainders, the donor gave each

of Laura's two sons a share equal to one-half of the percentage of the income given their mother, to wit, two and six thousand, six hundred and sixty-seven ten-thousandths per cent. As a matter of fact, while the distribution made to Laura was equal to that of the other nephews and nieces, taking into consideration the value of the farm, the share of the sons in the remainder was much less than that of the other grandnephews and grandnieces.

This result the respondents Kreidler claim was due to a mistake in computation by the donor and that his real intent was that they should share equally with the others. From evidence showing the friendly relation of the parties, the papers upon which the donor made computations, and other preliminary drafts, the respondents claim to have shown conclusively that it was the intent of the donor that there should be equal division. We will assume that as far as is humanly possible to show what was at one time in the mind of a person now deceased, the proof is sufficient to justify a finding that the donor held all his grandnephews and grandnieces in equal affection, and that he made a mistake in his computations. The respondents urge, and have succeeded in their claim, that as between the beneficiaries of a deceased donor the written agreement may be reformed and the donor's definite language may be nullified and set aside and new provisions inserted to carry out the intent which was existent in his mind at or before the time the instrument was drawn.

It is conceded that there is no authority in this State establishing a clear precedent for such a conclusion, but it is argued that the legal principle is well established in other jurisdictions and may properly be applied here.

It seems to us a dangerous doctrine. Heretofore our courts have held in passing upon the written language used by a man disposing of his property to take effect after his death, that its jurisdiction extends only to the interpretation of ambiguous language in the instrument, or to a declaration of its invalidity. There is no distinction in principle between the provisions in wills and in other written instruments which dispose of property after the death of the giver. There is, of course, a difference made by statute in the manner of execution, and in the administration of the property. Courts of equity have not assumed to exercise jurisdiction to make a new agreement or a new will for a party and to interject therein in the place of plain provisions, other provisions which the court may say the decedent had in his mind at some time but which he mistakenly omitted. (See *Nelson* v. *McDonald,* 61 Hun, 406, 411.) Mistakes in names or in descriptions of property in the grant or will of a deceased person, due to the

carelessness of a scrivener have in rare instances been corrected, after hearing parol testimony, on the theory that it is a construction of an ambiguity to give effect to the plain intent of decedent. (See *Matter of Coughlin*, 171 App. Div. 662; affd., 220 N. Y. 681.) The mistake must appear on the face of the instrument itself. Reformation may be granted to a volunteer under similar circumstances, where the donor or grantor is living, the mistake is satisfactorily established, and the ends of justice demand it. (*Delap* v. *Leonard*, 189 App. Div. 87; *Schrieber* v. *Goldsmith*, 39 Misc. 381.)

It is quite certain that at some time Dorus Healy had in his mind a purpose to distribute remainders equally among grand-nephews and grandnieces surviving at the time the distribution was made, and among the children of those deceased. But having given consideration to the subject he wrote in his own hand the percentage to be distributed to Leland and Dana W. Kreidler. It is likely that he made a mistake in the legal effect of these provisions and believed at the time that he was giving them a share equal to that from which their mother received an income. But his own words deliberately chosen are to the contrary, and the theory that he had a positive intent to do otherwise, and would make the change if he could now redraft the instrument, must rest largely upon conjecture. There can be no gift so long as it exists in an unexpressed intent. It becomes vital and is consummated only upon delivery of the property or the execution and delivery of an instrument which conveys title. " A court of equity cannot by its authority render that gift perfect which the donor has left imperfect." (*Young* v. *Young*, 80 N. Y. 422, 437.)

A donor may not be charged with a mistake in a gift made in one of the methods just mentioned, nor may other property be claimed by a donee because at one time the donor had some purpose or intent of making a different gift. The gift as made must be deemed conclusive as representing the final intent of the donor. While there is perhaps no dispute amongst the parties as to this principle, the respondents assert in effect that where there are two gifts to different parties, one may claim the property given to another because the donor had at one time indicated an intent to give that particular property to the claimant rather than to the one who received it. It is quite evident that if this be the true doctrine relative to gifts, made either during the lifetime of the donor or by a trust agreement or by will, a wide and unexplored field will be open for claims and litigation respecting property thus given. The acts, writings and declarations of the deceased donor may be examined to determine whether or not his deliberate written instrument represents an original intent or does substantial

justice between relatives whom he may have appeared to hold equally in esteem and affection. In this case if we adopted the interpretation that after-born children may share, the property of those unborn and unrepresented here might be depleted by a reformation of the instrument giving a larger share in the remainder to the Kreidlers.

There are, as we have said, authorities in other jurisdictions cited on the briefs and in the opinion of the court below indicating that a court of equity may, as between volunteers, make reformation, after the death of the donor, of certain provisions of a document affecting only themselves. None is approximate in similarity to the facts here. It would serve no useful purpose to discuss or attempt to distinguish these authorities. Very largely they deal with errors in the description in a deed and the mistakes of a scrivener which defeat the definite purpose in the mind of the grantor; and such errors have been corrected. Because the donor drew the agreement in his own hand, the able counsel of respondents contend his error was that of a scrivener. The claim is ingenious but unsound. There are equally respectable authorities in other jurisdictions that as between volunteers the courts will not entertain jurisdiction to correct a defective instrument. Such in general has been the prevailing doctrine in this State from our early judicial history. (See *Minturn* v. *Seymour*, 4 Johns. Ch. 497, 500.) Our courts will not make a new agreement to substitute in the place of one unsatisfactory to one party, nor will they relieve a party from performance except for fraud, mutual mistake or other sufficient reason. (*Cameron-Hawn Realty Co.* v. *City of Albany*, 207 N. Y. 377.) Courts are not at liberty to revise positive provisions or permit evasion thereof while professing to construe. (*Sun P. & P. Assn.* v. *Remington P. & P. Co.*, 235 N. Y. 338, 346.)

We are reluctant to introduce a new, and as we view it, dangerous doctrine into the settled law of the State. We hold that a court has no power or jurisdiction to go behind the definite language of the agreement and substitute new terms for those written by the donor. " A will cannot be corrected because the testator misapprehended its effect. Nor as a general rule, is parol evidence admissible to supply omissions, or to control or explain the intention, or vary the legal construction." (*Arthur* v. *Arthur*, 10 Barb. 9, 16.) The same rigid rule must be applied to a trust agreement disposing of the donor's property very largely after his death.

The judgment in the respects considered should be reversed, and a judgment granted in accordance with the views herein expressed. Findings of fact Nos. 17, 18, 23 and 26 are disapproved and reversed; and conclusions of law Nos. 1, 2, 6 and the 2d para-

graph of No. 7 are disapproved. New findings may be settled by the parties on three days' notice.

Costs are allowed to each party filing a separate brief in this court payable out of the trust estate.

The appeal from the order denying defendants' motion for a new trial should be dismissed, without prejudice and without costs.

SEARS and CROUCH, JJ., concur; HUBBS, P. J., and CLARK, J., dissent as to the judgment and vote for affirmance. All concur as to the dismissal of the appeal from the order.

Those portions of the judgment considered in the opinion are reversed, and new provisions inserted in lieu thereof in accordance with the opinion. The other provisions in the judgment not the subject of controversy are approved and affirmed. Certain findings of fact and conclusions of law disapproved and reversed and new findings made, with costs to each party appearing upon this appeal by separate attorney and filing brief, payable out of the trust fund. Settle order and findings on three days' notice before DAVIS, J. Appeal from order denying motion for a new trial on the ground of newly-discovered evidence dismissed, without costs and without prejudice.