## In re Estate of Anna B. Austin, Deceased.
First Trust & Savings Bank, Trustee under the Will of Anna B. Austin, Deceased, Appellant, v. Frederick C. Austin, Individually and as Executor under the Will of Anna B. Austin, Deceased, Appellee.

### Gen. No. 31,187.

1. GIFTS—*when evidence unsufficient to show intent that property shall pass by gift and not under will.* Where a testatrix, whose will left all of her property not otherwise disposed of to her husband, provided in the codicil thereto that a certain necklace be sold and the proceeds invested in securities, the income from which should be paid to her husband for life, and pursuant to instructions given by her subsequent to the execution of the codicil, her agent having charge of the necklace sent it to jewelers whom she had directed to sell it, and shortly thereafter on the day preceding her death and while in a foreign country with her husband, the testatrix stated to a third person that she was going to give the husband her jewelry and wished to give instructions so that he might "have possession" of them, and then dictated and signed a communication to the jewelers directing them to deliver her jewels or the proceeds thereof to her husband "as his own and to do with as he elects," and also a communication in similar terms to her agent, adding thereto that the agent had her only will in which she "willed all" to her husband and gave these letters to her husband, it will be held that it was not the intention of the testatrix to make a gift of the necklace to her husband, but that it was her intention that it should pass to him under the will.

2. GIFTS—*insufficiency of constructive delivery where possession not acquired.* A letter written by one the day preceding her death to her agent having custody of certain personalty instructing the agent to deliver the personalty to the husband, which letter was given by her to the husband who never presented it to the agent and who did not take possession of the personalty until six months after her death is not a sufficient delivery to satisfy the requirements of a gift either *inter vivos* or *causa mortis,* regardless of the fact that it was the writer's intention to make a gift.

3. GIFTS—*essentials of delivery.* The delivery necessary to complete a gift, and without which it will fail, irrespective of the question of intent, is such a delivery as will divest the alleged donor of all dominion of the subject matter of the gift, and by which he loses all right of custody and control over it.

4. GIFTS—*insufficiency of intent unaccompanied by delivery.* Evidence that testatrix signed a paper which she erroneously supposed would revoke a codicil of her will and give all her property to her husband, will not support a gift *causa mortis* of certain property otherwise bestowed in the codicil nor is it impliedly or expressly a revocation of the codicil under Cahill's St. ch. 148, ¶ 19.

5. GIFTS—*evidence of alleged donee's construction of instrument claimed to effect.* That a husband did not claim his wife's jewels were a gift to him *causa mortis* until he filed the inventory as executor of her estate a year after her death during which time he treated the jewels as part of her estate, tends to show that he did not think the written order by which his wife asked her jeweler to turn her jewels over to him was a valid transfer of control of the jewels to him as a gift *causa mortis.*

6. WILLS—*manner in which codicil may be revoked.* Under Cahill's St. ch. 148, ¶ 19, no expression by a testatrix that she wished to revoke a codicil and give all her property to her husband is effective as a revocation unless carried out in the manner the statute directs.

7. WILLS—*revival of bequest by reacquisition of bequeathed personalty.* The common-law rule, which is the law in Illinois, under which a subsequent conveyance by a testator, in his lifetime, of real property devised by his will operates as an implied revocation of the devise and the devise is not revived by the reconveyance of the land to the testator in his lifetime, does not apply to a bequest of personalty; but where personalty is reacquired under such conditions the bequest is revived.

O'CONNOR, J., dissenting.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1926. Reversed and cause remanded with directions. Opinion filed March 2, 1927. Rehearing denied March 15, 1927.

PACKARD, PECKHAM & BARNES, for appellant.

ISAAC B. LIPSON, for appellee; FRED E. NEWTON, of counsel.

MR. JUSTICE THOMSON delivered the opinion of the court.

The First Trust & Savings Bank, as trustee, filed a petition in the probate court of Cook county, praying

that the court require the respondent, Frederick C. Austin, as executor of the estate of his deceased wife, Anna B. Austin, to inventory as part of the estate, a certain pearl necklace, and to deliver it to the bank as trustee, under a codicil to the will of the deceased. After a hearing in that court the petition was dismissed. Upon appeal to the circuit court of Cook county and a hearing in that court, a decree was entered again dismissing the petition from which decree the bank has perfected this appeal.

The deceased, Anna B. Austin, was married twice. By her first marriage to John W. Ogden, she had two children, Wesley Ogden, who now has one child, and Marian Ogden Richardson, who now has four children. By her second marriage to the respondent, Frederick C. Austin, the deceased had no children. Mr. and Mrs. Austin were married in 1889 and she died, at the age of 67 years, on June 30, 1922.

In 1903, Mrs. Austin created a living trust involving property to the extent of $1,600,000, under the terms of which the income was to be paid to her for life and if her husband survived her the trust was to continue for the period of his life, the trustee paying to him, so long as he lived, an income of $6,000. It will not be necessary to note the provisions of this trust, covering the ultimate disposition of the property involved in it. On March 18, 1907, Mrs. Austin made a will leaving all of her property, not otherwise disposed of, to her husband. She later executed three codicils to the will, only the first of which need be noted here. This first codicil was executed on January 2, 1914. By the terms of it she devised and bequeathed a string of 57 pearls to the First Trust & Savings Bank, as trustee, with directions to sell them and invest the proceeds in interest bearing securities. By this codicil she further directed that the income from the trust fund thus created be paid to her husband during his life and upon his

First Trust & Savings Bank v. Austin, 243 Ill. App. 386.

death it was to be divided into as many equal shares as there were grandchildren of hers then surviving, and she directed that the interest of each share be thereafter paid to such grandchildren or the issue of such grandchildren, until the attainment of the age of 21 years, whereupon the principal sum of each share was to be paid over to them.

Mrs. Austin lived abroad most of the time during a period of 13 years, ending in 1920, when she returned to Chicago, which she had apparently always regarded as her permanent home. The record shows that some time before 1920 Mrs. Austin developed a cancer and she was advised by doctors in Europe and also in New York and Chicago that there was no hope of arresting the progress of the disease and that it would ultimately cause her death. In June, 1922, Mr. and Mrs. Austin left for Europe, taking with them as a guest a Mrs. Watson who was a Christian Science practitioner, and a maid, Marie Thelen. There is evidence tending to show that when they left, Mrs. Austin did not anticipate that her illness might result fatally in the near future, for she planned to take a trip of four months, and there is evidence indicating clearly her expectation of returning at the end of that period.

One Purvin, who had been connected with Mr. Austin in various companies and enterprises in which he was interested for many years, and who had charge of all moneys, accounts and other matters connected with Mr. Austin's business affairs, also looked after Mrs. Austin's financial matters. At the time she left for Europe in June, 1922, he had jewels, furs, securities and valuable papers belonging to her in his possession and custody. Forth & Powell were jewelers in the city of New York. They had done business for Mrs. Austin on and off over a period of some three years prior to 1922. A day or two before Mr. and Mrs. Austin sailed from New York for Europe, she called

at the office of Forth & Powell, who then had in their possession various pieces of jewelry belonging to her. She discussed these articles of jewelry with them and also told them that she would send them a pearl necklace and a pearl brooch, and that she wished she had brought them with her. She said she wanted the necklace sold for the best price obtainable, the jewelers to use their judgment as to its value. They were to receive 10 per cent of the selling price as their commission. Under date of June 11, from New York, Mrs. Austin wrote Purvin in Chicago, asking him to go to the vault and take out this pearl necklace and a certain brooch which she described, and send them to Forth & Powell. Purvin carried out these instructions and the necklace and brooch were duly received by the New York jeweler on June 21, 1922.

Mr. and Mrs. Austin sailed on June 13, and reached Hamburg, Germany, on June 23. On the Monday following she became very ill and she died on the following Friday, June 30. Mrs. Watson testified that in the course of the forenoon of Thursday, June 29, Mrs. Austin remarked to her that "it doesn't look as though you were going to bring this out," thus intimating that she thought death was approaching. She further testified that later in that forenoon, Mrs. Austin called her into the room where she was lying in bed and said, "I am going to give my husband my jewelry and other property and I want you to take some instructions so that he may have possession of them." When this was said, Mr. Austin was present, but after it was said he left the room and at Mrs. Austin's direction, Mrs. Watson procured writing materials and at Mrs. Austin's dictation she wrote out two communications. After they were prepared, Marie Thelen, who had been passing in and out of the room, supported Mrs. Austin in bed while she signed them. Following that, at Mrs. Austin's request, Mrs. Watson read the communica-

First Trust & Savings Bank v. Austin, 243 Ill. App. 386.

tions to Marie Thelen, and then at her further request both Mrs. Watson and Marie Thelen signed them. One of these communications was addressed to Forth & Powell and read as follows: "Please deliver to my husband, F. C. Austin, or upon his order, all my jewelry and property left with you, or the proceeds thereof, as his own and to do with as he elects." The other communication was addressed to Purvin, and it read: "Please deliver to my husband, F. C. Austin, all money, securities, jewelry, property and personal belongings, as his own and to do with as he sees fit. The only will I have made is the one I handed you several years ago for safe keeping, in which I willed all to my husband." After these communications had been written and signed, Mr. Austin returned to the room and Mrs. Austin handed them to him and he retained them in his possession.

During the first week of July, Mr. Austin advised Purvin of his wife's death and under date of July 8, the latter advised Forth & Powell of her death, adding: "We think this automatically cancels whatever instructions Mrs. Austin may have given with reference to her jewelry in your hands. * * * Mr. Austin will be executor of Mrs. Austin's estate and later will give you instructions with reference to the disposition of the jewelry you have belonging to her, and in the meantime kindly take no action." This letter was sent by Purvin in Austin's name. Forth & Powell still had the necklace in their possession.

The communication addressed to Forth & Powell by Mrs. Austin, and by her delivered to her husband on June 29, was never presented by him to them. Six months later, namely, on December 20, 1922, Mr. Austin's lawyer gave him a certified copy of the letters testamentary issued by the probate court of Cook county, appointing him executor of his wife's estate and suggesting that he write Forth & Powell request-

ing them to send him the jewelry in their possession, which had been the property of Mrs. Austin, so that it might be appraised and inventoried. On the next day Mr. Austin wrote such a communication to Forth & Powell, inclosing the certified copy of his letters testamentary, and requesting them to forward the jewelry which they had. The jewelry which had been in their possession and which they forwarded to Mr. Austin at this time, consisted of 67 different articles, including 13 rings, 10 brooches, 6 hat pins, 2 pendants, a turquoise collar, 3 bracelets, 8 necklaces, including the one referred to in the first codicil of her will, and a number of pins, chains, and other smaller articles. This jewelry was sent to Mr. Austin by Forth & Powell on January 12, 1923, and five months later—on June 14, 1923—he filed his inventory, as executor of his wife's estate, in the probate court. In making it up he did not include the necklace as a part of the estate, but he attached a memorandum to his inventory to the effect that ''The following property has been transferred to Frederick C. Austin under and by virtue of a gift *causa mortis* made to Frederick C. Austin by the deceased, Anna B. Austin, in her lifetime, on to wit: June 29, 1922.

''JEWELRY.

''1484—67—B—Necklace 1—58 graduated pearls—$100,000.''

Subsequently, Mr. Austin sold this necklace for $75,000, it being agreed by the First Trust & Savings Bank that in case the necklace was sold for that amount no objection would be afterwards raised on their part, because it had not been sold for a greater amount. This sale took place after the filing of the petition by the bank seeking an order of court requiring the respondent, Austin, to turn the necklace over to the bank as trustee.

First Trust & Savings Bank v. Austin, 243 Ill. App. 386.

The first question to be determined is whether the respondent became the owner of the necklace in ques-.tion by virtue of a gift *causa mortis,* made to him by his wife, as he claims, on June 29, 1922.

There is considerable discussion in the briefs on the question of whether the law of the domicile or of the place where the property was located, at the time of the alleged gift, controls. It is the contention of the ·respondent that the authorities support the proposi-·tion that such a transaction as the one involved here, is controlled by the law of New York, where the property was located, .rather than by the law of Illinois, which was the domicile of the parties, although if the transaction amounted to a gift under the law of the domicile, it would be good anywhere. In a supplemental petition filed by the petitioner, the law of Germany on the subject of gifts was pleaded and it was alleged that the transaction should be controlled by that law, as the *lex loci contractus.* The respondent answered denying that the law of Germany was ·as pleaded and further that the law of Germany was controlling. No proof of the German law was submitted. However, we regard this question as immaterial, for the respondent pleaded that the alleged gift was good under both the law of New York and the law of Illinois, and in the brief filed in this court, counsel for the respondent say it is not claimed "that the law of Illinois differs in any material respect from that of New York," but merely that what the courts of New York have had to say on the subject of gifts "should prove more helpful to this court by reason of the fact that the courts of New York have so frequently considered the question of gifts evidenced by instruments in writing where the facts were very similar to those in the instant case."

The petitioner contends that the evidence fails to show, with that degree of clearness required by the

law in order to establish a gift, that in dictating the communication to Forth & Powell and in delivering it to her husband on the day before her death, she intended to make him a gift of her pearl necklace, and the respondent concedes "that unless the evidence proves an intent to make a gift, the title of the respondent" (as donee) "must fail." If the only evidence on this question consisted of the letters dictated and signed by Mrs. Austin on June 29, or if it was to be found only in some of the remarks she made prior to that time or on that day, we would be inclined to the view that the evidence failed to show that she even had the pearl necklace in mind at that time./ These letters and the remarks to which we refer, make no mention of this particular article of jewelry, and the latter are further to the effect that her purpose in dictating the letter to Forth & Powell was to enable her husband to "get possession" of her jewelry. There was a large amount of jewelry belonging to her in their possession. When it was sent by them to Mr. Austin in January, 1923, it was shown to comprise 67 items. She had made a will leaving all this jewelry to her husband and later the codicil, leaving only one of the pieces, namely, the pearl necklace, to the petitioner as trustee. Considering the letter addressed to Forth & Powell by itself, it may be said to be strange that if it was intended to be an instrument of gift of this pearl necklace,—which was the only one of the many pieces of jewelry belonging to Mrs. Austin, which she had not so treated in her will as to make her husband entitled to possession of them after her death—that no specific mention should be made of it. But there is other evidence in this record, bearing on this question of intent, which must be considered together with these letters and the remarks of Mrs. Austin above referred to. In our opinion, this other evidence tends strongly to show that when Mrs. Austin dictated the

First Trust & Savings Bank v. Austin, 243 Ill. App. 386.

letter to Forth & Powell and when she made the remarks referred to, she had this necklace, as well as her other jewelry, in mind, and that her intention then was that her husband was to have it, but even with the help of this additional evidence, we believe it may not reasonably be said that an intention to make a gift of the necklace to her husband is shown to have been present in Mrs. Austin's mind. The reasons leading us to believe that she did have the pearl necklace, as well as all her other jewelry, in mind, on June 29, are the following: She had only recently taken very definite action affecting the status of this necklace. Less than three weeks before, she had told Forth & Powell that she was going to have this necklace sent to them,— that she was sorry she had not brought it along with her from Chicago,—and that she wanted them to sell it for her. She still had this necklace in mind as she discussed some of her affairs with Mrs. Watson, while they were crossing on the steamer, for the latter testified that Mrs. Austin told her, at that time, not only that she felt her two children had been amply provided for in trust funds and that "she wanted Mr. Austin to have the rest of her property and jewelry," but also "that she was having these pearls," as well as "some other jewelry" sent to Forth & Powell, to be sold, and that her reason for this action was "because she did not wish it to go to the children." In view of these prior events, we think she still had her pearl necklace in mind when she dictated the letter to Forth & Powell, for in it she not only mentioned all her jewelry left with them, but also "the proceeds thereof," apparently referring, with some other jewelry, to the necklace which had so recently been sent to them with instructions to sell it. In order to accomplish her definitely expressed intention and object not to have her jewelry go to her children, it was not necessary that this necklace be given to her husband. She might

either let it go to the petitioner, as trustee, as provided in the first codicil to her will, or arrange that it go to her husband along with all the remainder of her jewelry, under her will as originally drawn. In view of her action in putting the necklace in the hands of Forth & Powell for sale, we think it clear that in dictating the two letters on June 29 her intention was to accomplish her object by arranging that the necklace or the proceeds of its sale go to her husband under her will, together with all the rest of her jewelry. The fact that her attempt failed to accomplish her intention is beside the point. That she was without any knowledge as to how, legally, to effect her intention, is apparent. All the many articles in the possession of Forth & Powell at that time, as well as the proceeds of the sale of this pearl necklace and one or two other articles, if they had then been sold, were property which would pass to her husband under her original will in case of her death. Similarly, there were other articles of personal property as well as money, in the hands of Purvin, which would likewise pass to her husband under the terms of her original will, in case of her death. As she puts it, for the purpose of enabling her husband "to go and get possession," of this property, after her death, which then seemed near, she dictated these letters to both parties in whose custody this property was, and expressed herself in the same way in both letters, asking Forth & Powell to deliver to her husband "all my jewelry and property left with you, or the proceeds thereof," and asking Purvin to deliver to her husband "all money, securities, jewelry, property and personal belongings." Purvin had Mrs. Austin's will in his custody. As showing that she had her will in mind, and that in dictating these two letters and giving the similar directions they contained, she was attempting to facilitate her husband's gaining possession of all the property referred to under her

First Trust & Savings Bank v. Austin, 243 Ill. App. 386.

will, she added a sentence in the letter to Purvin, saying that the only will she had made was the one she had handed him some years before, "for safe keeping, in which I willed all to my husband." These letters are nothing more nor less, in our opinion, than directions to persons in whose custody much of her personal property was, requesting them to deliver possession of it to her husband, pursuant to her will, in which she had left "all to my husband." We attach no special significance to the words requesting these bailees to turn over all the property in their care to her husband, "as his own and to do with as he elects," or "as he sees fit." Disregarding the pearl necklace for a moment, all the property in the possession of Forth & Powell and of Purvin would go to Mr. Austin under the original will, and when the time came to turn it over to him, it would go to him "as his own," under the terms of that will, notwithstanding the fact that, under the law, he would take it, in the first instance, as executor, and be obliged to inventory it and account to the probate court for its disposition. And now, including the necklace with all the other property covered by these letters, there is no indication of any intention in Mrs. Austin's mind, other than it should be turned over in just the same way she was requesting the bailees to deliver all the other property to her husband, "as his own and to do with as he elects." We fail to appreciate any reason why these letters or what Mrs. Austin had to say to Mrs. Watson as to her purpose in dictating them, should be construed as showing an intention on her part to make a gift, then and there, to her husband of the pearl necklace, any more than we see any reason why they could reasonably be construed as showing an intention on her part to make a present to him of all the other property referred to in them. We believe that the fact that she put this pearl necklace in the hands of Forth & Powell to be

sold, together with the fact that she said what she did to Mrs. Watson, while on the steamer and after arriving in Europe, referring specifically to these pearls, as well as her other jewelry, and the further evidence made up of these letters, leads clearly to the conclusion that her intention was that this necklace or its proceeds should go to her husband under her will, but fails to show any intention on her part to make any *gift* of the necklace, to her husband. Only one other bit of testimony need be referred to on this question. Mrs. Watson testified that when Mrs. Austin called her into her room on the day these letters were dictated, she said, "I am going to give my husband my jewelry and other property." Those words, in our opinion, may not properly be given the effect of indicating that Mrs. Austin was then attempting to give this necklace or the other property to her husband or that such was her object in dictating the two letters shortly thereafter. This is clearly shown by her words which immediately followed the ones just quoted, which were, "and I want you to take some instructions so that he may have possession of them." In our opinion, these words may not reasonably be construed as meaning anything more than. if Mrs. Austin had said to Mrs. Watson, "I have so arranged my affairs that my husband is to get my jewelry and other property and I want you to take some instructions so that he may have possession of them." That such was her intention is shown by her own designation of these letters she immediately thereafter dictated. She called them "instructions," given so that her husband might have possession of "my jewelry and other property." For these reasons we are of the opinion that the evidence fails to show that Mrs. Austin had any intention of making a gift of this necklace to her husband, although it does indicate an intention on her

part that it should go to her husband, under her will, along with all the rest of her "jewelry and other property."

But even if the evidence did show that Mrs. Austin's intention was to make a gift of this necklace to her husband on June 29, it would not necessarily follow that a gift was consummated. It is respondent's contention that the title to this·necklace was "transferred to him by virtue of a gift *causa mortis*" made to him by his wife on that day, as expressed by him in the memorandum attached to the inventory he filed as executor of his wife's estate on June 14, 1923. Whether a gift be one *causa mortis* or *inter vivos,* it is necessary to. its validity that there be delivery of the subject of the gift,—actual or constructive. *Barnum v. Reed,* 136 Ill. 388; *Telford v. Patton,* 144 Ill. 611. On this point the New York courts have said that "The intention to give is often established by most satisfactory evidence, although the gift fails. * * * there may be the most explicit declaration of an intention to give, yet, unless there is delivery, the intention is defeated." In *Basket v. Hassell,* 107 U. S. 602, the court pointed out that "a *donatio mortis causa* must be completely executed, precisely as required in the case of gifts *inter vivos,* subject to be divested by the happening of any of the conditions subsequent; that is, upon actual revocation by the donor, or by the donor's surviving the apprehended peril, or outliving the donee, or by the occurrence of a deficiency of assets necessary to pay the debts of the deceased donor. These conditions are the only qualifications that distinguish gifts *mortis causa* and *inter vivos.* On the other hand, if the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary dis-

position, good only if made and proved as a will.'' In *Williams v. Chamberlain,* 165 Ill. 210, the court said it was regarded as settled law, ''that it is necessary to the validity of all gifts, whether *inter vivos* or *causa mortis,* that there be delivery of the subject of the gift or acts equivalent to a delivery,'' and further that they considered it clearly established in that case that it was the intention of the alleged donor that the petitioners should have the insurance which was the subject of the gift there contended for, ''but if, from mistake of law, he failed to do those things which the law requires to carry his intention into effect, mere proof of his intention, however positive and convincing, cannot change the title to the property.'' *In re Miller,* 64 Misc, 232, 119 N. Y. Supp. 52, is to the same effect. In another New York case, *In re Van Alstyne,* 207 N. Y. 298, the court said that ''even if the intention of the testator to make the gift were most satisfactorily shown, the gift would fail unless a delivery of the thing given were also shown * * *. It is necessary for the public good to·require clear and satisfactory evidence of the fact to prevent fraud and perjury. There must be a delivery which results in a present change of dominion and ownership. Intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given,'' citing a long line of New York decisions to the same effect. Schouler, in his work on Personal Property (2d Ed.) sec. 97, quoted with approval by the New York court in *Van Cleef v. Maxfield,* 103 Misc. 448, 171 N. Y. Supp. 333, says that ''delivery by the donor, either actual or constructive, operating to divest the donor of possession of and dominion over the thing, is a constant and essential factor in every transaction which takes effect as a completed gift. Anything short of this strips it of the quality of completeness which distinguishes an

intention to give, which alone amounts to nothing, from the consummated act, which changes the title. The intention to give is often established by most satisfactory evidence, although the gift fails.''

But it is the contention of respondent that in determining the question of delivery, the intention of the parties with respect thereto is controlling, citing such cases as *Gordon v. Adams,* 127 Ill. 223; *Weaver v. Weaver,* 182 Ill. 287; *Barnes v. Banks,* 223 Ill. 352; *Hill v. Kreiger,* 250 Ill. 408; *Hoyt v. Northup,* 256 Ill. 604; *Northern Trust Co. v. Swartz,* 228 Ill. App. 622; 309 Ill. 586; *First Nat. Bank of Chicago v. O'Byrne,* 177 Ill. App. 473; and *Moore v. Moore,* 237 Ill. App. 190. In our opinion these cases may not properly be applied to such a situation as we have before us in this case. In the *Gordon* case notes signed by a father payable to his sons, but never placed in their possession, were found among the papers of a daughter, a sister of the payees, when she died five years after the death of her father. The question was whether, in placing the notes in the hands of his daughter, there was a delivery to the sons. In determining that question, under those facts, the court said the intention of the father was the controlling element. There was no evidence showing how the notes had come into the daughter's possession. Of course, if the father's acts and words tended to show he had put them there, intending that act to be for the benefit of his sons, the element of delivery would be made out. In the case at bar Mrs. Austin's purpose in placing the necklace with Forth & Powell is known. It was for the purpose of selling it. So far as the evidence shows, it remained, —and if it were sold, the proceeds would continue to be—subject to her order. We have already discussed what we believe the evidence shows as to her intention, in giving her order on Forth & Powell, to her husband. It was not to make a gift.

The *Swartz* case is similar to the *Gordon* case in that it involves a delivery of the subject matter of the alleged gift by Mrs. Swartz to one (her brother-in-law) for another (her brother-in-law's wife). It also involved writings to each of the alleged donees containing words of an absolute and unconditional gift to take effect immediately. They were sufficient to pass title. The court held that where the alleged donor had left certain bonds with her brother-in-law for safekeeping, and subsequently wrote him a letter saying it was her desire that the bonds be given to his wife "to hold in fee simple," the gift was complete without actual delivery of the bonds themselves to the wife; that the question of delivery to the wife was to be determined from the evidence showing the intention of the donor, and the evidence showed that the intention was that the possession of the brother-in-law was for the benefit of his wife.

The *Weaver* case involved the question of the delivery of a written assignment, the *Hill* case and the *Hoyt* case, of deeds,—all these writings being sufficient to pass title, and it was held that intention was the controlling element which determined whether these writings had been delivered,—so as to complete gifts of the property involved and that on that question the declarations and conduct of the alleged donor in relation to the writings may be shown, because such declarations and acts in relation to the· writings may be such as to become equivalent to actual delivery of the writings, where such actual delivery of them was wanting. The *Barnes* case involved an instrument of present, unconditional and express gift, which the court pointed out, contained language by which "the gift took effect and was complete immediately upon the delivery of the paper." There was some uncertainty as to how much property was to be included in the

gift and it was held that all the circumstances might be examined to find the intention of the donor in that regard.

The *O'Byrne* case involved a check drawn by an alleged donor on her bank account for an amount in excess of her deposit and handed by her to an alleged donee, a short time before the donor's death. The bank book of the latter had become misplaced and to be sure and cover the balance, which the donor could not remember, the check was drawn in round figures, which turned out to be more than the deposit. The court held that a complete gift *causa mortis* had been made out, saying that the facts showed the donor "intended to and did in fact, part with all further dominion over the bank deposit and surrendered the same," to the donee. The theory of the *O'Byrne* case is that a check may amount to a complete valid assignment of the drawer's bank account (which would therefore pass title), as between him and the payee, although under the Negotiable Instruments Law [Cahill's St. ch. 98, ¶ 210] it would not bind the drawee until accepted by the latter. It would seem that a check could not amount to an assignment of funds to the credit of the drawer, even as against the payee of the check, under the provisions of section 188 of the Negotiable Instruments Law, Cahill's St. ch. 98, ¶ 210. But in our opinion the decision in the *O'Byrne* case is not in accord with the established rule in this State on the subject of gifts involving checks. In *Martin v. Martin,* 89 Ill. App. 147, and in the same case in 113 Ill. App. 597, it was held that the gift of a check was not complete until payment or acceptance by the bank on which it was drawn, and is revoked by the death of the drawer, before payment or acceptance by the bank. The decision of the Appellate Court in 113 Ill. App. 597 was affirmed by our Supreme Court in 212 Ill. 301.

In a note on this subject in 20 A. L. R. 177, the author states that the rule in most jurisdictions, including New York, is that a check may not be the subject of a valid and completed gift until it is paid or accepted, and a number of cases, including the *O'Byrne* case, are noted as illustrating a minority rule.

The writing given by Mrs. Austin to her husband on June 29, 1922, was, in some respects, analogous to a check, in that it amounted to an order on Forth & Powell, directing them to deliver the jewelry and property left with them, or the proceeds thereof, to her husband. Assuming Mrs. Austin intended to make a gift of the necklace, if that order had been presented to Forth & Powell, in Mrs. Austin's lifetime, and they had acted upon it and turned the pearl necklace over to him, it may be that a gift of it would have been completed. But the order was of no force or effect after her death, after which time Forth & Powell would not be justified in acting upon it. *Jennings v. Neville*, 180 Ill. 270; *Trubey v. Pease*, 240 Ill. 513; *Felter v. Erwin*, 206 Ill. App. 518; *Foley v. Harrison*, 233 Mo. 460, 136 S. W. 354; *Augsbury v. Shurtliff*, 180 N. Y. 138; *Farmers' Loan & Trust Co. v. Winthrop*, 238 N. Y. 477.

In the *Moore* case, 237 Ill. App. 190, the court was discussing the question of whether a gift had been made as to some certificates of stock and some other securities, and in this connection said that it was necessary, under the legal rules governing gifts, "only that the intention to give and the intention to accept must in some intelligible manner be manifested. The common manner of expressing the process is, there must be a delivery and acceptance of the subject of the gift." The court then pointed out that in some of the decided cases it had been said "there was no intention to give because there was no sufficient delivery of the thing given," while in others it had been argued

that "the delivery did not disclose an intention to make a gift." The court then said that the statement that the donor must part with the dominion over the subject of the gift "affords no aid to a conclusion, for if a gift is established the power of control * * * has passed to the donee from the donor." We are unable to agree with such circuity of reasoning or with the apparent conclusion of the court that intention alone, if apparent, is sufficent to establish a gift. The court relies, in reaching that conclusion, on *Otis v. Beckwith,* 49 Ill. 121; *Weaver v. Weaver,* 182 Ill. 287; *Hoyt v. Northup, supra; Hill v. Kreiger, supra;* and *Weber v. Christen,* 121 Ill. 91, in all of which cases a deed or other written document was involved and the question was whether the evidence showed an intention to deliver it. Even on the theory laid down by the court in the *Moore* case, it fails to support the respondent's contention here, for the court said in that case that if the conduct of the parties is "consistent with the necessary intention to pass and accept title and inconsistent with any other reasonably assignable theory," a gift would be established. We have already indicated why we believe, in the case at bar, that the conduct of the parties was not only consistent with another "reasonably assignable theory," but clearly was that the respondent was to take this necklace under such other theory.

In any case involving a deed, or a bill of sale, or an assignment, or a written "instrument of gift" purporting to make a present and unconditional gift, any one of which is sufficient, in and of itself, to pass title to the property described therein, provided the document was delivered, where the question presented is whether there was such a delivery, the element of intention is controlling. There the question is, Did the person in question intend to deliver the writing? But that is not at all the situation in a case involving an

alleged gift where a constructive delivery is sought to be made out by virtue of some writing which is not sufficient to pass title. In such a situation there may be no question of the intention to deliver the writing in question. It may also be clear that the one who made the writing intended to make a gift of the property referred to therein. But if the writing was merely an executory order, not acted upon within the lifetime of the alleged donor, the gift would fail. In such a case the element of intention is not controlling.

In *Williams v. Chamberlain*, 165 Ill. 210, the court again discussed *Otis v. Beckwith, supra,* and referring to that case, said: "It is true that in the argument in the opinion much stress was laid upon the intention of the donor as the controlling element, but what was said in this regard must be read with reference to the case before the court. The intention without accompanying acts would avail nothing. * * * Whatever may have been the intention of the deceased, if his acts in undertaking to dispose of the policies in question are of a testamentary character they cannot prove effectual, there being no compliance with the Statute of Wills. * * * It was not intended by anything said in the *Otis-Beckwith* case to change the rule, which we regard as settled law, that it is necessary to the validity of all gifts, whether *inter vivos* or *causa mortis,* that there be a delivery of the subject of the gift or acts equivalent to a delivery."

There, of course, need not be an actual delivery of the subject of a gift in order to complete it. There may be a constructive delivery. Did the order on Forth & Powell, delivered by Mrs. Austin to her husband on June 29, amount to a constructive delivery of the pearl necklace? Respondent contends that it did. In support of that contention he again relies on cases involving some writing like a deed or bill of sale or assignment or "instrument of gift," sufficient, in itself,

to convey title to the property involved.  One case relied upon, which does not seem to be in that class, although even in that case the court said that the writing involved ''would have been a sufficient assignment on its face to pass title, if so intended,'' is the case of *Ellis v. Secor,* 31 Mich. 185.  In that case, a woman named Hill was found dead.  She had been under obligations to a Dr. Ellis, who had done much for her. The court said there was no room for doubt that she intended to give Dr. Ellis her property and that the only question was whether ''after she had done all in her power to accomplish this end, it has failed for want of any legal formality.  And the only formality supposed to be wanting is delivery, actual or constructive.''  In that case the deceased was found to have written on a slate by her bedside: ''I wish Dr. L. S. Ellis to take possession of all, both personal, real and mixed.  *Rachael Hill.*  I am so sick, I believe I shall die; look in valise.''  In the valise was an envelope directed to Dr. Ellis, containing a memorandum signed by the deceased, reading in part, ''I wish you to take possession of all my effects, to do with them as you see fit.''  The court said there could be no doubt concerning the meaning of the memorandum.  It was unconditional and unequivocal.  ''We think it clear that Rachael Hill did all that she could to create a gift *causa mortis,* and fully intended it, and that her written declaration should prevail as a valid appointment to the uses indicated, as fully as if there had been a manual delivery of the securities.''  In this Michigan case the court sustains an alleged gift on the trust theory, apparently because they were of the opinion that the writing involved was sufficient to. pass the title.

The delivery necessary to complete a gift and without which the gift will fail, irrespective of the question of intent, is such a delivery as will divest the alleged

donor of all dominion over the subject matter of the gift, and by which he loses all right of custody and control over it. Without such a delivery the title to the property will not pass but will remain in the donor. *Millard v. Millard,* 221 Ill. 86; *Williams v. Chamberlain, supra; Barnum v. Reed, supra; Telford v. Patton, supra; Taylor v. Harmison,* 179 Ill. 137; *In re Miller,* 64 Misc. 232, 119 N. Y. Supp. 52; *In re Van Alstyne,* 207 N. Y. 298; *Van Cleef v. Maxfield,* 103 Misc. 448, 171 N. Y. Supp. 333; *Union Trust Co. of Rochester v. Boardman,* 215 App. Div. 73, 213 N. Y. Supp. 277; *Simpkins v. Old Colony Trust Co.,* 254 Mass. 576, 151 N. E. 87. Again we refer to what the United States Supreme Court said in *Basket v. Hassell,* 107 U. S. 602, "If the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will."

Even assuming an intention on the part of Mrs. Austin, to make a present gift of the pearl necklace to her husband, we are of the opinion that her order on Forth & Powell, delivered to her husband, and all she said and did, as shown by the evidence, failed to accomplish it for it fell far short of meeting the foregoing requirements. In this connection, we consider it significant that Mr. Austin himself apparently did not consider, and certainly did not treat, that document as an instrument of gift, transferring this necklace to him as donee, until a year after he received it, when he came to file his inventory as executor of Mrs. Austin's estate. He never presented the document to Forth & Powell, to whom it was addressed, nor did he ever request them to turn over the necklace to him as his property by virtue of an alleged gift. On the contrary, on advice of his counsel, he told Forth & Powell that nothing of Mrs. Austin's effects could be

sold until after the will was probated and the executor appointed and to govern themselves accordingly and, when he had been appointed executor, he obtained a copy of his letters testamentary and sent them to Forth & Powell and requested them to send him the jewelry which had been left with them and they sent it all on to him as executor, including this necklace. Thus he treated all of it as property coming to him as executor, only asserting his individual ownership when he later came to file his inventory. We consider this course on his part as tending to show that he himself did not attach the meaning to the order of June 29, on Forth & Powell, for which he now contends. Similar courses of conduct were so considered by the courts in *In re Miller, supra;* and *Barnes v. Banks,* 223 Ill. 352.

Finally, the respondent contends that the act of Mrs. Austin, in having her pearl necklace sent to Forth & Powell and directing them to sell it, had the legal effect of revoking the codicil and, therefore, even if the gift contended for failed for want of completion, the necklace would pass to him as executor under the original will. This contention may not be affected by any expression of Mrs. Austin as to her actual intention. Respondent does not contend that the codicil was or could be revoked by express intention in any other manner than that which is specified in section 17 of the Wills Act, Cahill's St. ch. 148, ¶ 19. That section provides that ''No will, testament or codicil shall be revoked, otherwise than by burning, canceling, tearing or obliterating the same, by the testator himself, or in his presence, by his direction and consent, or by some other will, testament or codicil in writing, declaring the same, signed by the testator or testratrix, in the presence of two or more witnesses, and by them attested in his or her presence; and no words spoken shall revoke or annul any will, testament or codicil in

writing, executed as aforesaid, in due form of law.'' What the respondent endeavors to establish is an implied revocation, which takes place, if at all, in consequence of a rule of law, ''independently altogether of the actual intention'' of the testator. 1 Alexander Commentaries on Wills, sec. 53; Beach on the Law of Wills, sec. 62, p. 110. This rule of law gives rise to what is sometimes called an ''intention'' to revoke, which intention is presumed as a matter of law, not from any expression of actual intention, but from acts of the testator, ''which show such a change in the condition of his estate as to raise a *presumption* that he intended to revoke a part or the whole of his will.'' *Phillippe v. Clevenger*, 239 Ill. 117. For example, a conveyance of real property previously devised will effect an implied revocation of the devise, because in such a situation the testator has made such a change in the condition of his estate that the law will presume an intention to revoke the devise. But such a revocation may not be implied from *any* ''change of circumstance affording satisfactory evidence of the testator's revoking intention.'' Alexander Commentaries on Wills, *supra;* Beach on Law of Wills, *supra.* The thing necessary to be shown, to accomplish the implied revocation, is such an *actual change in the condition of the testator's estate* as will imply such an intention, *''ex necessitate rei,''* as Alexander puts it. Nothing short of that will overcome the rigor of the rules the law has thrown about the testamentary disposition of property, for the purpose of guarding against fraud and imposition.

In the *Phillippe* case, *supra,* our Supreme Court held that a conveyance by a testator of lands which he had specifically devised by his will revoked the will as to those lands even though such lands might subsequently be reconveyed to the testator. The court said that the ground upon which such revocation by

implication will be held to have taken place is, "that the acts of the testator subsequent to its execution show an intention inconsistent with the will,—in other words, his acts show an intention that his will is not to be carried out as originally drawn." But it is entirely clear that the intention which the court there referred to was not actual intention, but what may be termed a legal intention arising by implication of law, *"ex necessitate rei,"* as the result of a change made by the testator in the condition of his estate, for the court immediately adds that section 17 of our Wills Act [Cahill's St. ch. 148, ¶ 19] applies only to a revocation of a will "where there is an express intention on the part of the testator to revoke a will," and not to a revocation "arising by implication of law from the acts of the testator which show such a *change in the condition of his estate* as to *raise a presumption* that he intended to revoke a part or the whole of his will."

The court pointed out in the *Phillippe* case that it was well settled by the common law of England that a conveyance by a testator of lands which he has specifically devised by his will revoked the will as to said lands, and that such a devise is not revived by reason of the fact that the testator subsequently acquires title to the lands conveyed. In volume 4, p. 529, of his Commentaries, Kent says that such revocation was "upon a technical ground that the estate has been altered or remodeled, since the execution of the will." In Page on Wills (2 Ed. 1926) sec. 455, that author says that the common-law rule of revocation by subsequent alienation "was based on the rule that after-acquired realty could not be devised." It being the rule at common law, that after-acquired real property could not be devised, a will was only effective as to the real estate of which the testator was seized at the time

of the making of the will. These common-law rules are in force in this State except in so far as they may have been repealed by statute. By section 1 of our Wills Act, Cahill's St. ch. 148, ¶ 1, a testator is given "power" to devise all the estate which he may have at the time of his death, whether real or personal. Our courts have held this to be a permissive provision only, so that the question of whether a will passes after-acquired real property is a matter of intention and unless such an intention affirmatively appears from the will it will not pass such real property. *Women's Union Missionary Soc. of America v. Mead,* 131 Ill. 338; *Cummings v. Lohr,* 246 Ill. 577. Where a will makes a specific devise of real estate then owned by the testator, there may not be said to be any expression of an intention to pass an after-acquired title and consequently the common-law rules referred to in the *Phillippe* case have not been altered by our statute and they still obtain here, as the court there holds, and inasmuch as a will is only effective as to real property of which the testator is seized when the will is executed, nothing to the contrary affirmatively appearing, a conveyance by the testator of such property which is covered by a devise in his will, thereby revokes the devise, even though the property may subsequently be reconveyed to the testator, the reason being that the act of the testator in making such a conveyance shows "such a change in the condition of his estate" (because of the rules referred to), as to raise the legal presumption that he intended to revoke such devise.

But in our opinion the situation is different in the case of personal property, because the underlying common-law rules affecting the devise and conveyance of personalty were different and they still are, under our statutes. As to personal property a will spoke as of the time of the testator's death, at common law, and nothing to be found in our statute changes that

rule. A will therefore always has, and still does, pass after-acquired personal property. Therefore, even if a testator made a conveyance of personal property, that would not, of itself, operate as a revocation of a prior bequest of such property, for he might reacquire it, and if so, it would still pass under the bequest. Of course, if he did not reacquire it, then upon the testator's death, there would be an ademption of the bequest, by reason of the conveyance. Page on Wills (2d. Ed.) secs. 456, 466.

That a conveyance, by a testator, of personal property previously bequeathed, will not revoke such bequest, is illustrated by the case of *Waldo v. Hayes*, 96 App. Div. 454, 89 N. Y. Supp. 69. There a testatrix made a bequest to Florence Hayes of "all my chinaware and my diamond brooch," and she bequeathed to another, all her "jewelry not otherwise disposed of." At the time of the making of her will, the testatrix owned a diamond brooch valued at $1,500. It was shown that after she made her will, she disposed of this brooch and purchased another one valued at $2,500. The latter brooch she owned at the time of her death. It was held that the bequest of "my diamond brooch" to Florence Hayes was not revoked when the testatrix disposed of the brooch she owned at the time she executed her will and that the one she owned at the time of her death passed to Florence Hayes under the bequest, and not to the other legatee as "jewelry not otherwise disposed of." In the course of the opinion the court said that it had been uniformly held by the courts of that State "that as to personalty the will of the testator speaks as of the death of the testator, and that any article of personal property which the testator owns at the time of his death, which answers to the description of the article bequeathed, passes under the will to the legatee named therein, although such article may not

be the identical article owned by the testator at the time the will was executed." Respondent contends that this decision is not applicable here because a New York statute expressly provides that such a conveyance shall not revoke either a devise of real property or a bequest of personal property unless it amounts to a statutory revocation or unless "a clear intention to revoke shall appear therefrom." In our opinion the statute may not be given the effect contended for, inasmuch as it refers only to a conveyance by which the testator's "estate or interest in property previously devised or bequeathed by him shall be altered *but not wholly divested.*"

In contending that a conveyance or an attempted conveyance of personal property makes a previous bequest thereof void, respondent cites the case of *Beard v. Beard,* 26 Eng. Rep. 844. In that case, one Beard, by a will executed in 1739, gave all his estate, real and personal, to his brother. In 1740, by a deed poll, he granted to his wife "all his substance which he now has or hereafter may have." A bill was filed by the wife seeking to enforce the rights she claimed under the deed poll, which she contended revoked the will. The court held that the deed poll could not take effect as a gift but that the question remained "whether this is not an act so inconsistent and repugnant to the will, that it may amount to a revocation though not an act strictly legal." The court held that the will was revoked as to all the personal estate by the deed poll, although the latter could not take effect as a gift or grant of the personal estate to the wife, and that the personal estate must be distributed as in case of an intestacy. As to the *Beard* case, petitioner points out that it was decided at a time when the revocation of a bequest could be brought about by showing merely an intention (meaning an actual intention) to revoke, on the part of the testator, which

rule was changed in England later by the English Wills Act, and has been limited in most jurisdictions in our country, including Illinois, to revocation by statutory methods.

It would seem to be clear that inasmuch as a completed disposition of personal property, whether by conveyance or gift, will not operate as a revocation of a bequest of such property, *a fortiori*, an ineffective or incomplete attempted disposition could not have that effect. It has been held that an attempted disposition of personal property may not result in an ademption of a prior bequest, as would have been the case if the attempted disposition had been completed, but that such attempt must be treated as a nullity and the bequest be permitted to take effect. *In re Frahm's Estate*, 120 Iowa 85, 94 N. W. 444; *Basan v. Brandon*, 8 Sim. 171; *Harrison v. Asher*, 17 L. J. Ch. N. S. 452; *In re Pearce*, 8 Reports (Ch. Div.) 805. In none of these cases was a revocation of the bequest either contended for or discussed. It seems to have been taken for granted by both court and counsel, in those cases, that, in no event, could an attempted disposition amount to a revocation by operation of law. In *Bennett v. Gaddis*, 79 Ind. 347, the court held such to be the law, even in the case of an attempted conveyance of real property by a deed which was invalid. Sometimes such a defective conveyance of real property, though not good as a conveyance, has been held to be effective as revoking a devise of real property, but not as an implied revocation by change of estate but by an express revoking instrument (Page on Wills, 2d Ed. sec. 458), which could not be possible in Illinois, in view of the provisions of section 17 of our Wills Act [Cahill's St. ch. 148, ¶ 19].

Being of the opinion, for the reasons we have given, (1) that the evidence fails to show Mrs. Austin had any intention of making a gift of her pearl necklace

to her husband; (2) that she, in fact, made no such gift; (3) that there was no such change in the condition of her estate as to this necklace, as to give rise to a legal presumption that she intended to revoke the codicil to her will, in which she had bequeathed the necklace to the petitioner, as trustee; and (4) that her attempt to bring about such a change may not be given that effect, we have come to the conclusion that the circuit court erred in entering the decree appealed from. That decree is, therefore, reversed and the cause is remanded to the circuit court with directions to enter a decree in accordance with the prayer of the petition.

*Decree reversed and cause remanded with directions.*

Taylor, P. J., concurs.

Mr. Justice O'Connor dissenting: I am unable to agree with the conclusion reached in the foregoing opinion. In my opinion Mrs. Austin intended to give the necklace to her husband, and the evidence shows that the gift was, under the law, a valid gift *causa mortis*. In determining this question all of the evidence in the record must be considered and not alone the letter or document addressed to the New York jewelers; that was only one piece of evidence. What she said to Mrs. Watson and to Marie Thelen, the letter she wrote to Purvin and all other evidence in the record must be carefully considered in determining not only whether Mrs. Austin intended to give the necklace to her husband, but also whether she accomplished that result.

The testimony of Mrs Austin and Marie Thelen is to the effect that she told them she wanted to give her jewelry, including the necklace in question, to her husband. The two documents, one to the New York jewelers and the other to Purvin, were prepared at her request, and after they were signed by Mrs. Austin and witnessed, they were handed by Mrs. Austin to her

husband. The document addressed to the New York jewelers told them to give all of her jewelry "or proceeds thereof" which she had left with them to her husband, so that he might have the property "as his own to do with it as he elects." The letter to Purvin told him to deliver to Mr. Austin all of Mrs. Austin's moneys, jewelry, etc., so that Mr. Austin might have them "as his own and to do with as he sees fit."

The majority opinion, in my opinion, correctly holds that Mrs. Austin intended to have the necklace go to her husband, but I am unable to agree with the conclusion reached in the opinion that she intended him to have it under the will. The majority opinion reaches the conclusion that Mrs. Austin intended that her husband should have the necklace under the will, in part at least, from the fact that Mrs. Watson testified that Mrs. Austin had told her that she wanted Mr. Austin to get "possession" of it, and that by this she meant to assist him in obtaining possession without having any difficulty on account of her death. In my opinion this is unwarranted. It ascribes to Mrs. Austin a legal knowledge not deducible from the evidence. In my opinion she used the word "possession" in a woman-like manner and not in a technical sense. She meant to give him the necklace. This is shown by the fact that in the letter she wrote to Purvin she told him to deliver her jewelry to Mr. Austin, when as a matter of fact that jewelry and other property belonging to her was then in Mr. Austin's possession, being in his safety deposit box in Chicago, so that she did not assist him in obtaining possession of that property. And this all goes to show, in my opinion, that she intended to give Mr. Austin the necklace and not that he should take it under the will.

The law in this State is well settled that a gift *causa mortis* will be sustained only where the intention to

make the gift is clear and there must be a delivery of the subject of the gift and title must pass at the time. Of course it must be made in contemplation of death and death must have resulted as contemplated. If what was said and done by the donor is insufficient to pass title, the gift will fail, although the intention to make the gift clearly appears. This is the law as announced in the majority opinion and with which I agree.

In my opinion the judgment of the circuit court of Cook county should be affirmed, because I am of the opinion there was a valid gift *causa mortis*.